IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-31046
_____

JANICE BROWN DORN,

Plaintiff-Appellant,

versus

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, Etc., et al.,

Defendants,

ELECTRICIANS PENSION TRUST FUND, Substituted Party for
IBEW Local 995, Electricians Health, Welfare and Benefit Plans,

Defendant-Appellee.

--------------------
Appeal from the United States District Court
for the Middle District of Louisiana
--------------------
May 18, 2000

Before JONES, DUHÉ, and WIENER, Circuit Judges.

PER CURIAM:

Plaintiff-Appellant Janice Brown Dorn ("Janice") appeals the district court's grant of summary judgment in favor of the Defendant-Appellee Electricians Pension Trust Fund ("the Plan"), dismissing her claim, ostensibly pursuant to a Qualified Domestic Relations Order ("QDRO"), for continued payment of pension benefits following the death of her ex-husband, Jack Lee Dorn ("Jack"). Jack was a former participant and, at death, a retiree and

pensioner under the Plan, which is governed by ERISA[1]. We affirm the district court's judgment dismissing Janice's claim.

I.

BACKGROUND

A.  Applicable Law:  ERISA after the Retirement Equity Act of 1984 ("REA")[2]

1.  REA Changes Pertinent to this Appeal

After ERISA had been on the books for approximately ten years, during which period the need for substantial modification had become apparent, Congress enacted REA.  Two innovations wrought by REA that are particularly pertinent to this case are (1) changes in mandated retirement plan benefits in the form of a revised version of the "Qualified Joint and Survivor Annuity" ("QJ&SA")[3] and (2) creation of a new procedure — unique and exclusive to ERISA — for obtaining otherwise prohibited assignments or alienations of pension plan benefits in the event of, inter alia, divorce: the "Qualified Domestic Relations Order" ("QDRO").[4]  Familiarity with

---

[1] Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.

[2] Pub.L. No. 98-397, 99 Stat. 1426, (codified at 29 U.S.C. § 1001 et seq.).

[3] See generally 29 U.S.C. § 1055.  (We recognize that "in the trade" these annuities are generally referred to as QJSAs, but we have included the ampersand to aid our readership in distinguishing the QJSA from the QDRO). REA also dealt with the Qualified Pre-Retirement Survivor Annuity, another type of ERISA benefit, which is not at issue here.

[4] See generally 29 U.S.C. § 1056(d).

the applicable terms of art is important and helpful in understanding the instant appeal. After surveying the key terms, we shall examine briefly the nature of the benefits that most ERISA retirement plans like the Plan are required to provide as automatic survivor benefits with respect to the retiring participant — for our purposes today, Jack's QJ&SA — and some of the alternative elections available. We shall then consider in greater depth the exception to ERISA's spendthrift proscription of alienation that REA brought to the table by creation of the QDRO, a mechanism for recognizing, inter alia, the interest of the non-participant spouse in benefits under such plans. Finally, we shall analyze Janice's QDRO in light of the foregoing to determine whether it was correctly interpreted by the Plan's plan administrator and the district court.

2. Terminology

- **Qualified Joint and Survivor Annuity**

ERISA's QJ&SA is unlike the typical joint and survivor annuity available in the commercial market, which commonly guarantees payment of a stipulated or determinable amount to two persons — frequently spouses — while both are living and, after the death of either person, to whichever of the two survives. ERISA's QJ&SA is an annuity —

> (1) for the life of the participant[,] with a survivor annuity for the life of the spouse which is not less than 50% of (and is not greater than 100% of) the amount of the

3

annuity which is payable during the joint lives to the participant and the spouse, and

(2) which is the actuarial equivalent of a single annuity for the life of the participant.[5]

Stated more simply, (1) the QJ&SA's annuity payments cease at the death of the participant spouse, regardless of whether his death

---

[5] 29 U.S.C. § 1055(d). The Plan helps eliminate the tendency to confuse the QJ&SA with the typical commercial product mentioned supra by calling its QJ&SA a "50% Husband-and-Wife Pension" and defining it to mean that "if the Participant dies before his Qualified Spouse, the latter will receive a monthly benefit for her lifetime of 50% of the Participant's monthly benefit" — such survivor benefit being referred to in the Plan as the "survivor's pension." The Plan defines "Spouse" as (1) "a person to whom a Participant is considered married under applicable law" and (2) a "Participant's former Spouse" "if and to the extent provided in a Qualified Domestic Relations Order...." The Plan then defines "Qualified Spouse" as the person who was married to the Participant [Jack] "on the date of Participant's death and had been married throughout the year ending with the date the Participant's pension payments start or, if earlier, the date of death; however, a Spouse is also a Qualified Spouse if the Participant and his Spouse were married for at least a year before his death." Thus, as Janice had been married to Jack for more than one year, she could have been a Qualified Spouse if she had been expressly recognized as such in her QDRO. See 29 U.S.C. § 1056(d)(3)(F)(i), (ii). The Plan contains an alternative definition of Qualified Spouse: "A person to whom a Participant was married on the date his pension payments started [so-called "pay status"] and for at least one year immediately before that, but who is divorced from the participant after that date, shall be considered his Qualified Spouse on the date of [Participant's] death," unless a QDRO provides otherwise. As Janice and Jack were divorced well before his pension payments started, this alternate definition is inapposite. As shall become apparent when we review the operable facts of this appeal and the provisions of Janice's QDRO, she meets none of the Plan's definitions of Qualified Spouse: She was not married to Jack on the date of his death, and she had not been married to Jack for the year preceding the commencement of his pension payments or for the year preceding his death. Most significantly, her QDRO does not recognize her as Jack's "Qualified Spouse" for purposes of the "survivor's pension" under the Plan.

4

occurs before or after the death of the non-participant spouse; and (2) if, but only if, the non-participant spouse survives the participant spouse does the survivor's annuity kick in.

- **Annuity Starting Date** "means the first day of the first period for which an amount is received as an annuity "[6] (whether by reason of retirement or disability).

- **Earliest Retirement Age** "means the earliest date on which, under the plan, the participant could elect to receive retirement benefits."[7]

- **Domestic Relations Order** "means any judgment, decree, or order (including approval of a property settlement agreement) which (I) relates to the provision of...marital property rights to a spouse [or] former spouse...of a participant, and (II) is made pursuant to a State domestic relations law (including a community property law)."[8]

- **Qualified Domestic Relations Order** means a domestic relations order ——

> (I) which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable <u>with respect to</u> a participant under a plan, and

> (II) with respect to which subparagraphs (C)

---

[6] 29 U.S.C. § 1055(h)(2)(A)(i)

[7] 29 U.S.C. § 1055(h)(3).

[8] 29 U.S.C. § 1056(d)(3)(B)(ii).

5

and (D) are met....[9]

Note that determination of whether a domestic relations order, which a state court renders, is "qualified" is made by the Plan Administrator, not by the court that granted the order.[10]

- **Alternate Payee** "means any spouse [or] former spouse...who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan <u>with respect to</u>" the participant.[11]  Note that "[a] person who is an alternate payee under a [QDRO] shall be considered for purposes of any provision of [ERISA] a <u>beneficiary</u> under the plan;"[12]  only the employee who is a member of the plan is a

---

[9] 29 U.S.C. § 1056(d)(3)(B)(i)(I) (emphasis added).  Subparagraph (C) provides that a domestic relations order be a QDRO only if it "clearly specifies," <u>inter</u> <u>alia</u>, the name and address of the participant and the alternate payee, the amount or percentage to be paid to the alternate payee, the plan or plans to which the order applies, etc.; and subparagraph (D) provides that a domestic relations order can be a QDRO only if it "(i) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan, (ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and (iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be" a QDRO.

[10] 29 U.S.C. § 1056(d)(3)(G)(i)(II)("the plan administrator shall determine whether such [domestic relations] order is a <u>qualified</u> domestic relations order" (emphasis added)).

[11] 29 U.S.C. § 1056(d)(3)(K)(emphasis added).  Use of the phrase "with respect to" makes clear that alienability under a QDRO is not limited to those benefits that are "payable to" a participant, i.e., only the participant's life annuity, but may also make other plan benefits, such as the surviving spouse's annuity available to an alternate payee.

[12] 29 U.S.C. § 1056(d)(3)(J)(emphasis added).

"participant."

### 3. Framework for Analysis

Employing the foregoing terms and paraphrasing the pertinent portions of the legislative history of REA[13] —— those regarding the QJ&SA and the QDRO —— establishes the appropriate framework within which this case should be analyzed. Since the enactment of REA, ERISA pension plans have been required to provide automatic survivor benefits, principally a QJ&SA, to participants who retire under such plans. As noted by the district court, a QJ&SA comprises two separate and distinct benefits: (1) An annuity for the life of the participant, and (2) a succeeding annuity for the life of the surviving spouse (if there is one) of not less than 50% of the participant annuity.[14]

To implement the importation of the QDRO procedure for accommodating situations such as divorce, community property partition, and the like, REA expressly exempted from ERISA's otherwise preemptive proscription of alienation of plan benefits, a narrowly limited set of permissible assignments to a similarly limited set of transferees, denominated "alternate payee," such as

---

[13] [S. Rep. No. 98-575 (1984), reprinted in 1984 U.S.C.C.A.N. 2547.

[14] Although not applicable here, the participant can waive the QJ&SA in favor of an alternate benefit permitted by the plan, but only with spousal consent and only during the applicable election period, being a reasonable time before the annuity starting date, not to exceed ninety (90) days. 29 U.S.C. § 1055(c)(1)(A)(i), (2)(A)(i), (7)(A).

a surviving spouse, of specified plan benefits that are payable with respect to the participant.[15] The QDRO is the REA-created mechanism employed to facilitate this REA-recognized, tightly circumscribed set of non-preempted assignments of benefits.

To be a QDRO, a domestic relations order must designate, inter alia, the spouse or former spouse as an alternate payee. A domestic relations order can only be "qualified" (and thus can only become a QDRO), however, if it creates or recognizes the existence of an alternate payee's right, or assigns to an alternate payee the right, to receive all or a portion of the benefits payable with respect to a participant under one of the expressly designated types of ERISA retirement plans, and meets the other requirements of the statute.

To be an alternate payee under a QDRO, the spouse or former spouse of a plan participant must be recognized in a state court's domestic relations order as having a right to receive all, or a portion of, the benefit or benefits under the plan with respect to the participant. Moreover, to be "qualified," a domestic relations order must clearly specify the nature and portion of the benefits to be received by the alternate payee. Even then, the order cannot be qualified if it requires the plan to provide any type or form of benefit not otherwise provided under the plan, or if it requires the plan to provide increased benefits. And, as noted in the

---

[15] See, e.g., Critchell v. Critchell, No. 98-FM-1304, (D.C. Cir. Feb. 10, 2000).

8

foregoing definitions, determination whether a domestic relations order is qualified and thus a QDRO is the job of a plan administrator.[16]

B.   Facts and Proceedings

Jack and Janice married in 1968.  Neither prior to nor during their marriage did Jack and Janice elect out of Louisiana's legal regime — the community of acquets and gains — for matrimonial property in that State; rather, they remained under the community regime at all pertinent times.[17]  Throughout the time that Jack and Janice were married to each other, he was a participant in the Plan, an ERISA employee pension benefit plan for union workers.

Jack and Janice divorced on April 25, 1991.  At that time, Jack was still a participant in the Plan:  His annuity starting

---

[16] The instant QDRO was obtained before Jack's annuity starting date, so there is no issue of timeliness here.  But cf. Rivers v. Central & Southwest Corp. et al, 186 F.3d 681 (5th Cir. 1999) (holding failure to obtain QDRO before death of retired participant and before vesting of second spouse's survivor benefit under plan prevents recovery by former spouse); cf. also Hopkins v. AT&T Global Info. Solutions Co., 105 F.3d 153 (4th Cir. 1997) (holding former spouse cannot obtain a QDRO for surviving spouse annuity after participant's retirement, as benefits vest in current spouse on retirement).  Absent a pre-existing QDRO expressly recognizing a former spouse as the alternate payee of the survivor's pension, the person who is the spouse of the participant at his retirement need not obtain a QDRO to establish the right to the survivor's pension; neither would a subsequent divorce divest that spouse of such right.  If the spouses were to divorce after a pension plan has gone into pay status, the non-participant spouse might be entitled to obtain a QDRO for a portion of the former participant spouse's lifetime annuity, assuming the applicable domestic relations laws of the cognizant state would support such a claim.

[17] See La. Civ. Code Ann. arts. 2326-28.

9

date had not arrived; indeed, he did not become eligible for pension benefits under the Plan until March 1, 1993 and did not receive his first check until August of that year. On the day in 1991 when they divorced, Jack and Janice executed an agreement settling their community property. It stipulated that Jack assigned to Janice "her" interest in his benefits under the Plan. This settlement agreement likely met REA's definition of a "domestic relations order" but it clearly failed to specify details sufficient to be deemed a QDRO; and neither party contends that it was or should have been.

Later that year, on September 27, 1991, Jack married Geraldine T. Duck ("Geraldine"). Jack and Geraldine were still married to each other (and had been for more than a year) when he retired for plan purposes and when his annuity starting date arrived. And, they were still married to each other on May 31, 1997 when he died.

On January 22, 1993, however, after Jack had married Geraldine but while he was still working and still a participant in the Plan, Janice obtained a domestic relations order from a state court in Louisiana. That order is labeled "Qualified Domestic Relations Order for Electricians' Pension Plan IBEW 995." It purports to divide and assign benefits accumulated under the Plan during the existence of Jack and Janice's community, identifying the benefits as marital property, designating Janice as "Alternate Payee," referring to Jack as "Participant," and otherwise making all recitations required for the domestic relations order to be

10

recognized by a plan administrator as a QDRO.

The order specifies that, as alternate payee, Janice "shall receive payment from [the Plan] of Participant...pursuant to the Participant's assignment of benefits to the alternate payee in the amount of...$302 per month....as of February 27, 1991, the date on which the community of acquets and gains ceased to exist...." The order also specifies:

> This assignment of benefits does not require the Plan to provide any type or form of benefit, or any option, not otherwise provided under the Plan. This assignment does not require the Plan to provide increased benefits determined on the basis of actuarial value. This assignment does not require the Plan to provide benefits to the Alternate Payee under another order previously determined to be a Qualified Domestic Relations Order.

The order declares that from its date

> the alternate payee shall have, with respect to the alternate payee's interest in the Plan, the exclusive right to receive such funds specified above and in the event of alternate payee's death, her estate shall receive those funds to which the alternate payee is entitled, in the event of survivor beneficiaries not named by alternate payee.

In reference to the designation of monthly payments of $302 to Janice, the order contains the following footnote:

> Division of Benefits: Sims v. Sims, 248 So.2d 919 (La. 1978) All funds accumulated under this Plan were accumulated during the existence of the community of acquets and gains. The community of acquets and gains existing between the parties hereto ceased as of February 27, 1991.

Jack became eligible for retirement on March 1, 1993, less

11

than two months after Janice had obtained that domestic relations order. The annuity starting date came and went, and pursuant to Janice's QDRO, the Plan began paying $302 per month to her. The remaining $321 balance of Jack's monthly pension benefit of $623 was paid to him, beginning August 1, 1993.[18] The total of these payments equaled the total amount of Jack's monthly participant's annuity under the Plan, i.e., his lifetime pension of $623 per month.

Effective at Jack's death on May 31, 1997, the Plan discontinued making monthly payments to Jack and to Janice that clearly were being paid to them from the participant's portion of Jack's QJ&SA. Also effective at Jack's death, the Plan began paying Geraldine the "survivor's pension" of $312 per month, being 50% of the participant's pension under Jack's QJ&SA.

Shortly after Jack's death, the Plan wrote to Janice advising of the cessation of payments to her as a result of (1) the termination of the participant's annuity at Jack's death and (2) the absence in the QDRO of a designation of Janice as Jack's Qualified Spouse for purposes of the survivor's pension. In July, 1997, through her attorney, Janice appealed to the Plan in writing to reinstate payment of the benefits that it had been paying to her before Jack's death; and, in September she appeared with her

_____

[18] Given the Plan's disbursements to Janice, we infer that the Plan Administrator determined that the domestic relations order of January 22, 1993 was "qualified" and thus a QDRO. Neither party contends otherwise.

12

attorney before the Plan's Board of Trustees —— its plan administrator —— to re-urge her appeal.  The Board of Trustees advised Janice by a September 24 letter to her attorney that her appeal had been denied.  Janice filed the instant lawsuit a month later.

In her complaint, Janice asserted that the Plan's refusal to continue benefit payments to her (1) violated ERISA; (2) was unconstitutional under the Fifth Amendment; and (3) constituted conversion of her property.  In June, 1998 the Plan filed a motion for summary judgment on all counts, maintaining that Janice was not entitled to payments of benefits following Jack's death because (1) the participant's annuity, out of which she had been receiving a $302 portion, terminated at participant's death, and (2) neither the Plan nor the 1993 QDRO provided for the payment of any other benefit to Janice after Jack's death, the only benefit remaining being the annuity of the surviving spouse, who was not Janice, but Geraldine, Jack's "Qualified Spouse."  The Plan also asserted that Janice's Fifth Amendment claim was baseless and that her state law claim of conversion was preempted by ERISA.

In September, 1998, the district court granted the Plan's motion for summary judgment, rejecting all of Janice's claims and dismissing her suit.  This appeal followed.

## II.

## ANALYSIS

A.    Standard of Review

13

We review the district court's grant of summary judgment under the well known <u>de novo</u> standard. Here, there are no disputed issues of material fact, only issues of law. Like the district court, we review a plan administrator's denial of benefits under a <u>de novo</u> standard, unless the plan gives the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan.[19] Neither Janice nor the Plan has asserted that the Plan's Board of Trustees, as plan administrator, has discretionary authority to determine eligibility for benefits; thus, any plan interpretation made by the Board when denying Janice's appeal for continued benefits is reviewed <u>de novo</u>.[20] More to the point, even if the Plan does vest its administrator with maximum discretion and that authority includes discretion to decide whether a domestic relations order meets the requirements for recognition as a QDRO, we would still review <u>de novo</u> the Board of Trustees' interpretation of the substantive provisions of Janice's QDRO. "Although we allow a plan administrator discretion to determine whether [a domestic relations order] constitutes a QDRO under the plan, we otherwise review <u>de novo</u> a plan administrator's interpretation of the meaning of a QDRO."[21]

---

[19] <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989).

[20] <u>Id.</u>

[21] <u>Matassarin v. Lynch</u>, 174 F.3d 549, 563 (5th Cir. 1999)(internal citation and quotation omitted). <u>See</u> <u>Samaroo v. Robichaud</u>, 193 F.3d 185, 189 (3rd Cir. 1999).

14

B. ERISA Claim

From the record on appeal and Janice's appellate brief, it is clear to us that she is seeking a continuation, for her lifetime, of the monthly $302 payment out of Jack's participant annuity only, from which she had received it during his lifetime by virtue of her QDRO; and that, because in the QDRO she is not designated as the surviving spouse (or "qualified spouse"), she is not asserting a claim to any part of Jack's QJ&SA that constitutes the survivor annuity (the "survivor's pension"), which Geraldine began to receive at Jack's death. As the district court in its ruling on motion for summary judgment touched on both possibilities, however, we shall as well.

1. Validity of QDRO

First, there is no dispute about the propriety of the plan administrator's having treated the state court's domestic relations order in this case as a QDRO: Not only does the order touch all of the bases from the standpoint of required contents under § 1056(d) by recognizing Janice as an alternate payee, expressing that it relates to marital property rights, and specifying the factual information required under subsection (3)(C); at least facially it also does not violate subsection (3)(D)'s prohibition of requiring the Plan to provide (1) any type or form of benefit or option not otherwise provided under the Plan or, (2) on the basis of actuarial value, any increased benefits. Neither does the order require payment of benefits to an alternate payee other than Janice (there

15

were no prior QDROs).  Moreover, the instant QDRO was applied for and obtained before Jack's (1) annuity starting date, (2) retirement, or (3) death.

2.  <u>Surviving Spouse Annuity</u>

Regarding any claim that Janice could possibly have asserted to all or any portion of the survivor's pension ⸺ again, it does not appear to us that she is asserting any such claim ⸺ the district court correctly determined that neither under any provision of the Plan nor under ERISA generally could Janice be deemed a surviving spouse in the context of Jack's QJ&SA:  She was no longer married to Jack (1) during the "applicable election period," (2) on the "annuity starting date," or (3) at his death. In fact, they had been divorced for more than a year prior to any of those events.  The district court correctly determined that as an alternate payee (and thus a beneficiary) by virtue of her QDRO, Janice did not obtain status as a surviving spouse ("Qualified Spouse") or any interest in the survivor annuity under the provisions of Jack's QJ&SA.  Section 1056(d)(3)(C) requires that a domestic relations order "clearly" specify, <u>inter</u> <u>alia</u>, the amount or percentage of the "participant's" benefits to be paid to the alternate payee.  The QDRO is silent on the issue of survivor's rights; the only Plan benefit of Jack's addressed in the QDRO is the one from which the QDRO specifies Janice's $302 per month was

16

to be paid, unmistakably the participant annuity.[22] Conversely, the monthly payment specified in the QDRO had no relationship whatsoever to the surviving spouse annuity facet of Jack's QJ&SA.[23] The domestic order nowhere designates her as the surviving or "qualified" spouse for purposes of any survivor benefit that is specifically allowed under the Internal Revenue Code.[24]

### 3. Participant Annuity

Regarding Janice's insistence that, following Jack's death, the Plan continue making monthly payments of $302 to her, the district court correctly determined that (1) the domestic relations order granted to Janice by the state court nowhere "clearly" states that she would continue to receive such payments after Jack's death (presumably for the remainder of her lifetime), and (2) had that

---

[22] See Samaroo, 193 F.3d at 187, n.2 ("[T]he original decree was silent on the issue of a survivor's rights. Congress has required QDROs to be quite specific in order to convey ERISA benefits. The statute requires a QDRO to state specifically the extent of the alternate payee's interest in the plan").

[23] The question whether a domestic relations order that purports to designate a former spouse of the participant as the "surviving spouse" alternate payee under a pension plan can still "qualify" for purposes of becoming a QDRO is not before us, for Janice's QDRO contains no such provision. The availability of such a specification is well settled by the Internal Revenue Code, provided the participant and the former spouse had, at some time in the past, been married to each other for a period of at least one year. See supra n.4. In such circumstances, the designation of the former spouse as the alternate payee of the surviving spouse annuity trumps any claims thereto by another person who subsequently becomes the de facto surviving spouse of the participant. See, e.g., Treas. Reg. § 1.401(a)-20 Q&A 25(b)(3).

[24] See § 414(p)(5), I.R.C.

17

domestic relations order contained such a provision as to Jack's participant annuity —— as distinct from the surviving spouse annuity —— it could not (or at least should not) have been recognized as a QDRO. On the first point, any fair reading of the words of Janice's domestic relations order confirms that it did nothing more or less than carve a $302 portion out of Jack's $623 monthly benefit under his lifetime participant's annuity. Nowhere in the QDRO is a reference to Janice's payments modified by "for life" or "for her lifetime" or any other such phrase. Her payments had to be co-terminus with his which, by definition, ceased as of his death. This expectation is confirmed by its obverse: Under one express provision of her QDRO, Janice's death before Jack's would <u>not</u> have terminated her $302 monthly payments; rather, following her death the $302 payments would have continued, month after month, until <u>his</u> death, and would have been paid either to her designated successor or to her estate, i.e., her heirs or legatees.[25]

Janice's domestic relations order specifies that she "shall receive payment from [the pension plan] of Participant, Jack Lee Dorn...." The only benefit that Jack had under the Plan was a

_____

[25] Janice's QDRO specifies that "in the event of the Alternate Payee's death, her estate shall receive those funds to which the Alternate Payee is entitled, in the event a survivor beneficiary is not named by Alternate Payee." As that provision deals with payments beyond <u>her</u> lifetime, the QDRO obviously contemplated the payment of her $302 <u>until</u> Jack's death in the event he should outlive her, but not <u>after</u> his death.

18

QJ&SA which comprised (1) his lifetime annuity (which was not, as in some commercial products, payable for as long as either spouse lived), and (2) the "survivor's pension," i.e., the surviving spouse annuity, equal to 50% of the Participant's lifetime pension. As already noted, the surviving spouse annuity is not addressed anywhere in the subject domestic relations order, and Janice has not expressly demanded any part of it.

In conclusion, we agree completely with the district court:

> The pension benefit component [of Jack's QJ&SA] in which [Janice] did receive payments, terminated upon the death of the participant. The survivor's annuity is the only benefit currently payable under the [Plan]. It vested in [Jack's] current wife on the date he became eligible for benefits.

C. Fifth Amendment Claim

Dorn also argues that the district court's interpretation of ERISA is a taking of her vested property without due process of law prohibited by the Fifth Amendment. There is no set formula for identifying a "taking" forbidden by the Fifth Amendment; rather, courts use an "ad hoc, factual inquir[y] into the circumstances of [the] case."[26] Dorn has not met her burden to show that she had any private property which has been the subject of a taking.

D. Conversion Claim

Dorn's last argument is that the Fund converted Janice's property to its own use. A state law claim, such as Dorn's claim

---

[26] <u>Connolly v. Pension Benefit Guar. Corp.</u>, 475 U.S. 211, 224 (1986).

for conversion, addressing the right to receive benefits under the terms of an ERISA plan necessarily "relates to" an ERISA plan and is thus preempted.[27]  Additionally, to the extent Dorn attempts to use the Louisiana law of conversion to interfere with a surviving spouse's benefits, that law is preempted.[28]

III.

CONCLUSION

Dorn has failed to show that the district court erred by granting summary judgment in favor of the Plan on all counts.  The judgment of the district court is, in all respects,

AFFIRMED.

---

[27]  See, Dowden v. Blue Cross & Blue Shield of Tex., Inc., 126 F.3d 641, 643 (5th Cir. 1997); see also Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 47-48 (1987) (common law cause of action alleging improper decision on claim for benefits undoubtedly meets criteria for ERISA preemption).

[28]  Boggs v. Boggs, 520 U.S. 833, 844 (1997).