TRUSTEES OF THE DIRECTORS GUILD OF AMERICA–PRODUCER PENSION BENEFITS PLANS, a collectively bargained, joint–trusteed labor–management trust, Plaintiff–Appellee,

v.

Suzanne R. TISE, an individual, Defendant–Appellee,

Cybele Tise–Myers, an individual; Chloe Tise–Myers, an individual, Defendants,

and

Yvonne Curry, an individual, Defendant–Appellant.

Trustees of the Directors Guild of America–Producer Pension Benefits Plans, a collectively bargained, joint–trusteed labor–management trust, Plaintiff–Appellant,

v.

Suzanne R. Tise, an individual, Defendant–Appellee,

Cybele Tise–Myers, an individual; Chloe Tise–Myers, an individual, Defendants,

and

Yvonne Curry, an individual, Defendant–Appellee.

Nos. 96–16799, 96–16994.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 6, 2000

Filed Dec. 6, 2000

Jeffrey W. Shopoff, San Francisco, California, for the plaintiff-appellant.

Ronald Dean, Pacific Palisades, California, for the defendant-appellant.

Catherine A. Elin, Novato, California, for the defendant-appellee.

Before: NOONAN, THOMAS and BERZON, Circuit Judges.

BERZON, Circuit Judge:

This interpleader action requires us to interpret the scope of the Qualified Domestic Relations Order ("QDRO") provisions of ERISA. Yvonne Curry, the designated beneficiary of Charles Myers' ERISA pension plan, appeals the district court's summary judgment distributing the bulk of Myers' plan proceeds to the moth-

er of his children, Suzanne Tise. The pension plan's trustees, for their part, appeal the district court's order awarding them $3,000 in attorneys' fees for their expenses incurred as interpleader plaintiff. We affirm the district court in both respects, although, on the merits, on a different legal analysis than the one adopted by the district court.

## I. Background

Myers, an independent television and film director, was a member of the Directors Guild and a participant in its ERISA-governed pension plan, the Directors Guild of America–Producer Pension Benefits Plan ("the Plan").[1] Before his death in 1995 three parties had emerged to assert competing claims on the proceeds of his pension plan: Curry, the designated beneficiary, with whom Myers was living at the time of his death; Tise, who had long ago obtained a state-court child support order; and the Internal Revenue Service ("IRS"). Although the IRS has withdrawn its claim, Curry and Tise remain locked in a bitter dispute over who is entitled to the plan proceeds.

The roots of this controversy are some three decades old. Tise and Myers lived together in the late 1960s and early 1970s, and together had two daughters, Chloe and Cybele. In 1981, several years after her relationship with Myers ended, Tise obtained a default paternity and child support judgment against him in Marin County Superior Court. Myers never paid child support voluntarily, and over the years, Tise collected only $11,502 from him.

In October 1991, Tise returned to state court, where she secured an Order to Show Cause barring the Directors Guild of America from disbursing any proceeds from Myers' pension plan without first notifying Tise's attorney. Although the or-

1. Myers' credits include the television series "Streets of San Francisco" and "Gomer Pyle."

der did not name the Plan, the Plan received a copy of this order in December of that year.

Not only did Myers shirk his child support obligations, he also neglected his income taxes. As a result he owed the IRS more than $450,000. In June 1994, the IRS served a notice of levy on the Plan, requiring the Plan to pay the IRS from Myers' pension plan proceeds in order to satisfy Myers' tax debt. Now faced with two claimants on Myers' pension plan proceeds, the Plan notified Tise's attorney in July 1994 that Myers' pension was soon to become payable and that other parties had asserted entitlements to the proceeds. In this letter, the Plan also asked whether Tise intended to obtain a QDRO. See generally 29 U.S.C. § 1056(d)(3).

In response to this letter, Tise immediately returned to Superior Court and obtained a writ of execution and a notice of levy against the Plan in the amount in which Myers was in arrears on his child support payments, $209,985.34. In December 1994, Tise secured an Order to Show Cause alleging that the Plan had failed to comply with the writ of execution and with Tise's request for an accounting of funds, and demanding that the distribution of Myers' plan proceeds be enjoined until a QDRO could issue.

At a hearing on that request on February 14, 1995, the Superior Court concluded that, under state law, the Plan had not been properly joined in the proceedings.[2] Tise then took steps to join the Plan, ultimately moving on March 30, 1995, for an order declaring her entitled to a QDRO. The Plan opposed Tise's effort to achieve joinder, and further took the position that Tise was ineligible as a matter of law to obtain a QDRO giving her a right to Myers' pension plan proceeds.

Meanwhile, on February 12, 1995, Myers died. Under the terms of his pension plan, death benefits, in the form of 120 monthly payments equivalent to those Myers would have received himself had he retired the day before he died, then became payable to his designated beneficiary. Less than two months before his death, on December 27, 1994, Myers had executed a designation of beneficiary form naming Curry as his sole beneficiary.

Faced with three competing claimants to the proceeds of Myers' pension plan, not all of whose claims could be satisfied, the Plan filed an interpleader complaint in the district court on April 26, 1995, naming as defendants Curry, Tise, and the United States. The Plan asked the court to determine how much money the Plan was obligated to pay to each, and deposited Myers' plan proceeds with the court's registry. Four days later, the Plan sought, ex parte, and obtained, a stay of Tise's state court proceedings pending the resolution of the interpleader.

In due course, Curry, Tise, and the United States filed their answers in the interpleader action. On August 22, 1995, the Plan noticed a motion for discharge from liability and dismissal from the action, and moved for attorneys' fees and costs. A hearing was scheduled on the Plan's motion but, following a case management conference on August 30, the hearing was vacated, and two weeks later the Plan withdrew its motions.

In November 1995, Tise moved for a stay of the interpleader action while she returned to state court to secure a QDRO. Curry and the Plan, but not the United States, opposed her motion. On February 16, 1996, the district court granted Tise's motion for a stay.

---

2. It is not clear why the state court thought the Plan had to be joined to the Tise–Myers child support proceedings. Although California law requires a pension plan to be joined to a divorce proceeding, see Cal.Fam.Code § 2060, a plan need not be joined to a support proceeding, see Cal.Fam.Code § 5103(a). In any event, California courts recognize that under ERISA, a plan need not be a party to a state court domestic relations proceeding in order to be bound by a QDRO that issues from that proceeding. In re Marriage of Baker, 204 Cal.App.3d 206, 218, 251 Cal.Rptr. 126 (1988).

Back in Marin County Superior Court, Tise secured an order on April 19, 1996, styled "Order re: QDRO for Child Support Arrears, Interest Accrued Thereon and Attorneys Fees and Costs Relating to Enforcement of Child Support." In the Order, the Superior Court noted that it had issued an order in 1991 "asserting its jurisdiction over Myers' employee pension plan benefits, including death benefits, and created in Tise the right to collect the child support arrears from Myers' employee pension plan benefits." The Superior Court determined that Tise was entitled to $326,438.85 in child support arrears and attorneys' fees related to enforcing her right to child support, and issued an order *nunc pro tunc* to October 11, 1991, "to effect the enforcement of the child support order of this Court entered 7–1–81 and the order of this Court of 10–11–81, which vested in Tise the right to collect the child support from Myers['] employee pension plan benefits."

Armed with this order, Tise returned to federal court, where the interpleader proceedings resumed. The parties stipulated to the Plan's dismissal from the action, and on June 13, 1996, the Plan renewed its motion for attorneys' fees. On July 23, the district court decided, on cross-motions for summary judgment and on the Plan's fees motion, to award $136,703.50 to the United States, $226,071.04 to Tise, and $3,000 to the Plan for attorneys' fees.

Both Curry and the Plan appealed the distribution of funds. Less than a week before oral argument on the appeals, the IRS withdrew its claim on the interpleaded fund, for reasons never explained. The panel that was to have heard the case remanded it to the district court for redistribution of the fund, but retained appellate jurisdiction.

On November 2, 1999, the district court entered an amended judgment and order, reallocating the proceeds of Myers' pension plan among Tise, Curry, and the Plan. Under the amended judgment, Tise received $226,701.04 in child support arrears and $97,367.81 in attorneys' fees, fully satisfying the 1996 state court order, the Plan again received $3,000 in attorneys' fees, and the balance of the fund ($39,335.69) went to Curry. Curry and the Plan resumed their appeals.

## II. The QDRO Provision

Curry argues that she is entitled to the entire fund because, as Myers' designated beneficiary, she automatically became vested in the death benefit upon his death in 1995, so that the order Tise obtained in 1996 requiring that the Plan pay the death benefit to her instead is unenforceable. To evaluate Curry's claim, we begin by closely analyzing ERISA's QDRO provision, a task that, unfortunately, requires some tolerance for acronyms.

### A. Overview

Prior to enactment of the Retirement Equity Act of 1984 ("REA"), the courts of appeals disagreed about whether state court orders issued pursuant to domestic relations proceedings could affect the distribution of pension benefits governed by ERISA. Some courts held that ERISA's blanket prohibition on the assignment or alienation of plan benefits, *see* 29 U.S.C. § 1056(c), barred assignments decreed by state courts in domestic relations actions. Responding to the confusion on this point, and "taking into account changes in work patterns, the status of marriage as an economic partnership, and the substantial contribution to that partnership of spouses who work both in and outside the home," Congress amended ERISA in 1984 specifically to provide for state-court-ordered assignments of plan benefits to former spouses and dependents. *See* Senate Judiciary Committee, S.Rep. No. 98–575 at 1 (1984); *see also Stewart v. Thorpe Holding Co.*, 207 F.3d 1143, 1149 (9th Cir.2000); *Ablamis v. Roper*, 937 F.2d 1450, 1452–53 (9th Cir.1991).

The REA created an exception to ERISA's general bar on the assignment of

pension plan proceeds for individuals who present QDROs to plan administrators. 29 U.S.C. § 1056(d)(3). QDROs are a subset of "domestic relations orders" ("DROs"); DROs are any orders relating "to the provision of child support, alimony, or marital property rights to a spouse, former spouse, child, or other dependent of a plan participant ... made pursuant to a State domestic relations law." 29 U.S.C. § 1056(d)(3)(ii). A DRO is a QDRO if it "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee[3] the right to, receive all or part of the benefits payable with respect to a participant under a[n ERISA] plan," 29 U.S.C. § 1056(d)(3)(B), and does not (1) require the plan to provide any type of benefit not otherwise provided, (2) require the plan to provide increased benefits, or (3) require benefits to be paid to an alternate payee which must be paid to another alternate payee under another QDRO, 29 U.S.C. § 1056(d)(3)(D); *see also Samaroo v. Samaroo*, 193 F.3d 185, 191 (3d Cir. 1999). Finally, a QDRO must specify the name and mailing address of the alternate payee and the affected plan participant, the amount or percentage of the participant's benefits to be paid or the means by which that amount will be determined, the number of payments or time period to which the order applies, and the plan to which the order applies. 29 U.S.C. § 1056(d)(3)(C). We recently examined this language and held that a DRO that substantially complies with these require-

ments is a QDRO. *Stewart,* 207 F.3d at 1153.

The QDRO provision is an exception not only to ERISA's rule against assignment of plan benefits but also to ERISA's broad preemption of state law. 29 U.S.C. § 1144(b)(7). State family law can, therefore, create enforceable interests in the proceeds of an ERISA plan, so long as those interests are articulated in accord with the QDRO provision's requirements.

## B. QDROs and Creation of Enforceable Interests in Benefit Plans

The central issue in this case—whether the Plan is required to honor the state court order Tise obtained in 1996—turns on the precise manner in which an alternate payee's state-law-created interest in an ERISA plan is enforced under ERISA's QDRO provisions.

Primary responsibility for determining whether a DRO is a QDRO that establishes obligations for an ERISA plan rests with the plan itself. 29 U.S.C. § 1056(d)(3)(G). Upon obtaining a domestic relations order in a state court proceeding, an alternate payee who seeks to establish a right to payment pursuant to that order from an ERISA-covered benefit plan must present the order to the pension plan administrator for a determination of whether it is a QDRO.[4] An alternate payee who thus submits a domestic relations or-

---

**3.** An "alternate payee" is "any spouse, former spouse, child, or other dependent of a participant who is recognized by a domestic relations order as having a right to receive all, or a portion of, the benefits payable under a plan with respect to such participant." 29 U.S.C. § 1056(d)(3)(K). The Plan argued before the district court that Tise could not be an "alternate payee" as a matter of law because she and Myers were never married. The district court rejected this argument on the grounds that the DRO was intended to benefit Tise's now-grown children when they were minors, minor children cannot represent their own legal interests, and as the children's mother, Tise was an appropriate "alternate payee." The parties have not appealed this issue.

**4.** In the case of any domestic relations order received by a plan—

(I) the plan administrator shall promptly notify the participant and each alternate payee of the receipt of such order and the plan's procedures for determining the qualified status of domestic relations orders, and

(II) within a reasonable period after receipt of such order, the plan administrator shall determine whether such order is a qualified domestic relations order and notify the participant and each alternate payee of such determination.

29 U.S.C. § 1056(d)(3)(G)(i).

der to an ERISA plan places the plan on notice that the DRO may be a QDRO, and that, under state law, the alternate payee may be entitled to some or all of the benefits that have accrued in the plan with respect to a participant.

Under this scheme, then, whether an alternate payee has an interest in a participant's pension plan is a matter decided by a state court according to the state's domestic relations law. Whether a state court's order meets the statutory requirements to be a QDRO, and therefore is enforceable against the pension plan, is a matter determined in the first instance by the pension plan administrator, and, if necessary, by a court of competent jurisdiction. *See* 29 U.S.C. § 1056(d)(3)(H)(i).

It therefore follows, as we recently explained, that "[t]he QDRO provisions of ERISA do not suggest that [the alternate payee] has no interest in the plan[ ] until she obtains a QDRO, they merely prevent her from enforcing that interest until the QDRO is obtained." *In re Gendreau*, 122 F.3d 815, 819 (9th Cir.1997), *cert. denied*, 523 U.S. 1005, 118 S.Ct. 1187, 140 L.Ed.2d 318 (1998); *see also Stewart*, 207 F.3d at 1156 (securing a DRO that creates an interest in the proceeds of a pension plan gives the bearer "the right to obtain a proper QDRO").

*Gendreau* illustrates this critical point. In *Gendreau*, this Court considered whether a plan participant could, by filing for bankruptcy, prevent his former wife from obtaining a QDRO giving effect to their divorce decree by awarding her a 50 percent interest in his pension plan proceeds. We concluded that the state court created the wife's interest in the husband's pension plan, and correspondingly limited the husband's interest in it, at the time of the divorce decree. *See Gendreau*, 122 F.3d at 818. That the ensuing payment order

did not meet the statutory requirements for a QDRO did not alter the parties' interests in the husband's pension plan proceeds. Rather, the wife simply had to return to state court for a revised order that would pass muster as a QDRO. *Id.* at 819. The divorce decree and original payment order, however defective under ERISA, allowed the wife to stake a claim to the husband's pension proceeds, but that claim could only be enforced by obtaining a QDRO.[5]

### C. QDROs and the Onset of Benefit Payments

■ Because a QDRO only renders enforceable an already-existing interest, there is no conceptual reason why a QDRO must be obtained before the plan participant's benefits become payable on account of his retirement or death. Several features of the statute's language and structure confirm that ERISA erects no such requirement.

*First*, for all the detail of the QDRO requirements, ERISA nowhere specifies that a QDRO must be in hand before benefits become payable.

*Second* and more significantly, the statute specifically provides for situations in which no valid QDRO issues until after benefits become payable. Once the pension plan is on notice that a domestic relations order has issued that *may* be a QDRO, the plan may take a reasonable period to determine whether the order is a QDRO and therefore creates obligations for the pension plan. 29 U.S.C. § 1056(d)(3)(G)(II). While the plan is making this determination, it must segregate the benefits that would be due to the alternate payee under the terms of the DRO during the first 18 months that those benefits would be payable if the DRO is ultimately deemed a QDRO. 29 U.S.C.

---

5. Curry relies upon *In re Norfleet*, 243 Ill. App.3d 925, 184 Ill.Dec. 63, 612 N.E.2d 939 (1993), for the proposition that benefits may not be assigned to an alternate payee unless a QDRO is obtained prior to the participant's

death. *Norfleet*, however, is grounded in a "no QDRO—no interest" analysis, *id.* at 943, that is irreconcilable with the law of our circuit as explicated in *Gendreau* and *Stewart*, and is therefore not helpful to our analysis.

§ 1056(d)(3)(H)(v). This benefit-segregation requirement obviously assumes that benefits may already be payable during the period the plan is determining whether the DRO is a QDRO.

Third, Congress expressly contemplated that further state court proceedings might ensue during the 18–month QDRO-determination period, through which the alternate payee could attempt to cure any defects in the original DRO and obtain an enforceable QDRO. There is no reason it should take any plan administrator 18 months to puzzle over the domestic relations order initially presented to the plan in order to determine whether it is a QDRO, and Congress did not intend to sanction such administrative lassitude. Rather, the evident purpose of the 18–month period was to provide a time in which any defect in the original DRO could be cured. The statute therefore provides that the alternate payee may, within the 18–month period, present the plan administrator, in lieu of the original court order, with a "modification thereof." 29 U.S.C. § 1056(d)(3)(H)(ii). If the plan administrator determines before the expiration of the 18–month fund segregation period that the modified court order is a valid QDRO, the alternate payee is entitled to payment of benefits. *Id.*

Again, *Gendreau* is illustrative. In *Gendreau*, the plan administrator determined that the first state court order submitted "did not qualify as a QDRO." 122 F.3d at 819. The state family court, however, had "retained jurisdiction to make any changes that might be deemed necessary by the plan administrator," and the plan administrator "anticipated that it may require multiple drafts of the order to meet QDRO specifications." *Id. Gendreau* recognized that it was precisely because "obtain[ing] a QDRO [is] a process which everyone (including Congress) recognizes as time-consuming" that "ERISA ... accommodates for periods when the status of a QDRO is at issue." *Id.*

*Fourth,* the statute also specifies with particularity the circumstances in which the putative alternate payee loses the right to hold up the payment of benefits to the participant or his designated beneficiary. After the 18 months have elapsed, if the DRO's status is still in doubt the plan must pay the segregated funds to the person who would otherwise have been paid. 29 U.S.C. § 1056(d)(3)(H). If the plan thereafter determines that the alternate payee's DRO is a QDRO after all, the plan must begin to pay the pension benefits to the alternate payee as directed by the order, although the plan is not required to pay the alternate payee retrospectively. 29 U.S.C. § 1056(d)(3)(H)(iv). Only after the requisite 18 months have passed, that is, is it possible for a designated beneficiary to have a right to any part of a participant's pension plan proceeds that cannot be displaced by a QDRO.

This complex, carefully articulated statutory scheme, then, plainly contemplates, and accounts in detail for, the situation in which the event that triggers the payment of benefits occurs *before* the plan knows whether it will be obliged to make payments to an alternate payee.[6] As such, the statute necessarily permits an alternate payee who has obtained a state law DRO before the plan participant's retirement, death, or other benefit-triggering event to perfect the DRO into a QDRO thereafter (subject to the 18–month period after

---

**6.** Whether a QDRO issued after a plan participant's retirement may affect the distribution of surviving spouse benefits pursuant to 29 U.S.C. § 1055 implicates statutory provisions and policy considerations other than those here applicable. *See Hopkins v. AT&T Global Info. Solutions Co.,* 105 F.3d 153, 156–57 (4th Cir.1997); *Rivers v. Central & South West Corp.,* 186 F.3d 681, 683–84 (5th Cir.1999).

We therefore leave to a case concerning § 1055 the determination whether, as *Hopkins* and *Rivers* determined, the plan participant's retirement cuts off a putative alternate payee's right to obtain an enforceable QDRO substituting the alternate payee for the surviving spouse with regard to statutory surviving spouse benefits.

which any previously-due benefits are payable to the original beneficiary).

This well-calibrated statutory system not only balances the interests of the plan and the various possible claimants to benefits while state family law orders are obtained but also assures that the ultimate rights of the putative alternate payees are resolved through legal proceedings rather than through manipulation or fortuity. If an alternate payee's right to ERISA plan proceeds were automatically cut off once an event occurred that, absent an enforceable QDRO, would make the proceeds payable to someone else, then a plan participant's retirement, the vicissitudes of court scheduling, or a plan participant's death, all events beyond the control of the alternate payee, could determine the parties' substantive rights.

Moreover, any such rule could encourage opponents of the putative alternate payee to delay or complicate issuance or approval of a QDRO in the hope that the benefit-triggering event would occur in the meantime. In this very case, for example, Myers died, apparently unexpectedly, while Tise was attempting, in the face of vigorous resistance by the Plan, to convert a DRO into an enforceable QDRO in state court. As the circumstances of this case illustrate, unless the QDRO could issue after the plan participant's death, Congress' intent to protect the interests of plan participants' former dependents could be thwarted. *Cf. Gendreau,* 122 F.3d at 819 ("allowing [the plan participant] to cut off [his ex-wife's] interest in the pension plans because of the timing of his bankruptcy petition would be contrary to ... ERISA" because doing so would not forward "the purpose of the QDRO exception ... to protect the financial security of divorcees").

### D. Curry's Additional Arguments

Curry offers two further arguments in support of her claim to Myers' death benefit, neither of which has merit.

First, Curry maintains that because ERISA provides that a QDRO "recognizes the existence of an alternate payee's right to ... receive all or a portion of the benefits payable *with respect to a participant* under a plan," 29 U.S.C. § 1056(d)(3)(B)(i)(I) (emphasis added), the alternate payee has no right to receive benefits once an event occurs that makes them payable to someone other than the participant. The argument, more specifically, is that upon Myers' death, there was no longer a benefit payable "with respect to" Myers, but only a benefit payable to a beneficiary, namely Curry, and therefore no QDRO affecting benefits payable "with respect to" Myers could issue after his death.[7]

This understanding of the term "benefits payable with respect to a participant under a plan" is not the one that a common sense reading would suggest, and cannot be squared with the statute as a whole.

"Benefits payable *with respect to* a participant" are, quite evidently, different from "benefits payable *to* a participant." In particular, the phrase Curry relies upon plainly contemplates that an alternate payee can receive payments that, but for the QDRO, would be payable to someone *other than* the participant-that is, to another dependent or designated beneficiary. *Cf.*

---

7. Curry relies for this argument on the Fourth Circuit's decision in *Hopkins v. AT&T Global Info. Solutions Co.,* 105 F.3d 153 (4th Cir. 1997). The Fourth Circuit did indicate that at the moment when the right to a participant's plan benefits vests in a beneficiary other than the participant, they are no longer "benefits payable with respect to a participant," but become "benefits payable to a beneficiary." *Id.* at 156. The issue before the court in *Hopkins,* however, involved a statutorily-created surviving spouse annuity under 29 U.S.C. § 1055, and the Fourth Circuit's overall analysis focused closely upon the language, legislative history, and purpose of that provision. *Id.* Because its analysis focused narrowly on the particular problem of surviving spouse benefits under § 1055, *Hopkins'* ultimate holding regarding the vesting of those benefits has no direct bearing in this case.

*Dorn v. International Brotherhood of Electrical Workers,* 211 F.3d 938, 943 n. 11 (5th Cir.2000) (explaining that "[u]se of the phrase 'with respect to' makes clear that alienability under a QDRO is not limited to those benefits that are 'payable to' a participant, i.e., only the participant's life annuity, but may also make other plan benefits, such as the surviving spouse's annuity available to an alternate payee"). This understanding is confirmed by the statutory definition of "participant":

> The term "participant" means any employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer or members of such organization, *or whose beneficiaries may be eligible to receive any such benefit.*

29 U.S.C. § 1002(7) (emphasis added). Since a "participant" is, under this definition, the employee or union member whose eligibility for benefits may trigger the eligibility of others, those others (the participant's beneficiaries) can quite sensibly be said to receive their benefits "with respect to"-in the sense of "on account of"-the participant even after the beneficiary's benefits become payable.

Only this reading of the statutory phrase "benefits payable with respect to a participant under a plan" is consistent with the statutory scheme as a whole. The statutory provisions covering the determination whether a DRO is a QDRO clearly contemplate that questions concerning the enforceability of DROs as QDROs can occur, and be resolved, after benefits become payable, and do not limit such post-benefit-onset QDRO determinations to situations in which it is the participant rather than someone else who would receive the benefits if the alternate payee does not. *See* 29 U.S.C. § 1056(d)(3)(H)(iii) (if there is no QDRO determination within 18 months, "then the plan administrator shall pay the segregated amount ... to the *person or*

*persons* [*not* the 'participant'] who would have been entitled to such amounts if there had been no order") (emphasis added).

The short of the matter is that there would be no benefits payable to Curry, Tise, or, for that matter, Myers, had he lived until his retirement, but for Myers' participation in the Plan. Those benefits remain payable "with respect to" Myers even after his death because they accrued for his benefit and that of his beneficiaries.

Curry's second argument is that she cannot be bound by the domestic relations orders issued in the Tise–Myers child support proceedings. *Cf. Baker v. General Motors Co.,* 522 U.S. 222, 238, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998). It is true that Curry was not a party to any of the state court proceedings in this case, and clearly, she could not be held personally liable for Myers' child support obligations.

The QDRO, however, does not impose personal liability on Curry. Rather, a QDRO creates obligations for the pension plan, not for any individual participant or beneficiary. *Cf. Gendreau,* 122 F.3d at 818, 819 (the debt created by a DRO is a debt of the pension plan, not of the plan participant, so that an alternate payee under a QDRO has a claim only against the plan). And the obligation of the pension plan is created without regard to the participation of any designated beneficiary or the plan itself in the state court proceedings that produced the QDRO. *See Blue v. UAL Corp.,* 160 F.3d 383, 385 (7th Cir. 1998). Rather, under ERISA, the pension plan must pay the bearer of a DRO if it determines that the order is a proper QDRO, without further inquiry; "[c]ompliance with a QDRO is obligatory." *Blue,* 160 F.3d at 385; *see* 29 U.S.C. 1056(d)(3)(A) ("Each pension plan *shall* provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order.") (emphasis added).

In face of the statute's clarity in this regard, it is hard to escape the conclusion

that Curry's quarrel is really with the scheme of the statute. Through its QDRO provisions, ERISA elevates a plan participant's legal obligations, commonly to a former spouse or children of a previous marriage, over the participant's express wishes to provide for other individuals as designated beneficiaries. While this result may seem harsh to the designated beneficiary, the fact is that Congress *intended* this displacement of a plan participant's wishes in some circumstances, in an effort to mitigate the impact of divorce upon children and former spouses. *Metropolitan Life Ins. Co. v. Wheaton,* 42 F.3d 1080, 1083 (7th Cir.1994) (noting that "qualified domestic relations order can override the designation of beneficiary in a pension plan"); *Carland v. Metropolitan Life Ins. Co.,* 935 F.2d 1114, 1121 (10th Cir.1991) ("Blindly paying the proceeds as specified in the insurance company's beneficiary designation forms would be inconsistent with the statutory preemption exception that recognizes the validity of domestic relations orders affecting beneficiary designations."); *see generally Metropolitan Life Ins. Co. v. Marsh,* 119 F.3d 415 (6th Cir.1997) (affirming district court's grant of summary judgment giving effect to QDRO held by plan participant's children from previous marriage, although the participant had designated his current spouse as his sole beneficiary).

### III.  Application of QDRO Provisions to this Case

We now apply the principles just established to the domestic relations orders Tise obtained to determine who was entitled to the proceeds of Myers' pension plan, and in what amounts.

The critical moments in the history of Tise's attempts to obtain payment of Myers' child support obligations from the Plan are Tise's 1991 order to show cause, the 1994 writ of execution, and the 1996 self-styled QDRO.

■ Although Tise argues that the 1991 order to show cause was itself a QDRO, we do not agree. The 1991 order merely required notice to Tise's attorney before disbursing Myers' pension plan benefits. That order was misdirected to Myers' union rather than his pension plan, and it did not specify or provide any means of determining an amount due to Tise, a payment schedule, or the ERISA plan to which the order applied. Given these defects, the 1991 show cause order cannot be a QDRO. 29 U.S.C. § 1056(d)(3)(C).

The 1994 writ of execution was much clearer. Tise obtained the writ of execution upon learning from the Plan that Myers' benefits were soon to become payable. The order unambiguously directed the Plan to pay $209,988.84 from "any and all monies held in the name of the judgment debtor, Charles A. Myers, located at the [Plan]" to satisfy a judgment in Tise's favor. On its face, this order "recognize[d] the existence of [Tise's] right to ... receive all or a portion of the benefits payable with respect to" Myers. 29 U.S.C. § 1056(d)(3)(B)(i)(I). At this point, Tise had only to obtain a QDRO, compliant with the statutory requirements, to enforce the interest created by the 1994 state court order. *See Gendreau,* 122 F.3d at 818.

By 1994, then, the Plan's obligation under ERISA to determine whether Tise's DRO was a QDRO was apparent. 29 U.S.C. § 1056(d)(3)(G)(i). The Plan should have determined whether the 1994 order was a QDRO, and, if the Plan concluded that it was not, allowed Tise to return to state court to secure a proper order— precisely what Tise was trying to do when Myers died.

Upon Myers' death on February 12, 1995, the proceeds from his pension plan became payable in the form of a death benefit. At that time, the Plan was obliged to segregate the funds that would be due to Tise if her order was ultimately deemed to be a QDRO within the 18-

month period for which ERISA provides.[8] Only if Tise could not obtain an order determined to be QDRO within 18 months would Myers' death benefit become payable to Curry.

■ On April 19, 1996, Tise obtained an order in state court that fulfilled all the QDRO requirements. This 1996 order directs that the child support arrears owed to Tise and attorneys' fees incurred in enforcing her 1981 child support order shall be satisfied from the funds that have accrued for Myers' benefit in the Plan. The order states a specific lump sum owed to Tise, thus satisfying the statutory requirement that the order include the amount owed and the number of payments. The order's only facial defect is that while it names Tise as alternate payee, it fails to provide her current mailing address. However, the order shows Tise's counsel's address on its face, and therefore, it would be a simple enough matter for the Plan to locate Tise for payment. *See Stewart*, 207 F.3d at 1152.

Because Tise had placed the plan on notice of her interest in Myers' pension plan proceeds before his death, the fact that he died before the QDRO issued is immaterial.[9] Tise obtained her QDRO well within the 18–month period the statute provides for segregating funds for the alternate payee's benefit. Because she is therefore entitled to a share of Myers' pension plan proceeds as determined by the state court pursuant to state law,[10] we affirm the district court's distribution of $323,438.85 from Myers' death benefit to Tise.

### IV. The Attorneys' Fees Appeal

■ Finally, the Plan appeals the district court's decision to award it only $3,000 in attorneys' fees, rather than the more than $97,000 it requested. The amount of fees to be awarded in an interpleader action is committed to the sound discretion of the district court. *Schirmer Stevedoring Co. v. Seaboard Stevedoring Corp.*, 306 F.2d 188, 194 (9th Cir.1962). The Plan has offered no basis for concluding that the district court abused its discretion in determining the fee award.

Interpleader is a valuable procedural device for ERISA plans who are confronted with conflicting multiple claims upon the proceeds of an individual's benefit plan. A plan in this position risks defending against multiple lawsuits brought by the adverse claimants. Interpleader provides a way out of this quandary, allowing the plan to petition the court to sort out the conflicting claims. *Aetna Life Ins. Co. v. Bayona*, 223 F.3d 1030 (9th Cir.2000). Thus, the interpleader plaintiff effectively disclaims any position as to which of the claimants is entitled to the fund.

■ At the same time, the availability of attorneys' fees for interpleader plaintiffs recognizes that by bringing the action, the plaintiff benefits all parties "by promoting early litigation on the ownership of the fund, thus preventing dissipation." *Schirmer Stevedoring*, 306 F.2d at 193. Because the interpleader plaintiff is supposed to be disinterested in the ultimate disposition of the fund, attorneys' fee awards are properly limited to those fees that are incurred in filing the action and pursuing the plan's release from liability, *not* in litigating the merits of the adverse claimants' positions. *Id.* at 194. Compensable expenses include, for example, preparing the complaint, obtaining service of process on the claimants to the fund, and

---

8. The Plan did in effect segregate the funds by paying them into the registry of the district court as part of its interpleader action.

9. We do not decide whether a QDRO could issue after a participant's death if the plan had no notice of a DRO-created interest before the death.

10. For these reasons, we need not determine whether the state court properly granted the 1996 order *nunc pro tunc* or whether the Full Faith and Credit statute, 28 U.S.C. § 1738, would require a federal court to give full effect to the order's *nunc pro tunc* aspect.

preparing an order discharging the plaintiff from liability and dismissing it from the action. *See id.;* 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 1719 & n. 20 (1986).

■ Because the scope of compensable expenses is limited, attorneys' fee awards to the "disinterested" interpleader plaintiff are typically modest. *See, e.g., Schirmer Stevedoring,* 306 F.2d at 194–95 (remanding for reduction fee award of $5,000 from $48,000 interpleaded fund); *Prudential Ins. Co. v. Boyd,* 781 F.2d 1494 (11th Cir.1986) (awarding attorneys' fees of $1,300 from $63,000 fund); *In re Technical Equities Corp.,* 163 B.R. 350, 360–61 (Bkrtcy.N.D.Cal.1993) (collecting cases). Moreover, because the attorneys' fees are paid from the interpleaded fund itself, there is an important policy interest in seeing that the fee award does not deplete the fund at the expense of the party who is ultimately deemed entitled to it.

The district court awarded the Plan only $3,000 in fees because unlike "a neutral stakeholder in a typical statutory interpleader action," the Plan "litigated this case vigorously, opposing Tise's entitle-. ment to the funds as if it had brought an action ... to enjoin practices that violate ERISA." Order at 4. The Plan's sole argument on appeal is that this finding was error; if it behaved unlike the typical interpleader plaintiff, maintains the Plan, it did this because the district court compelled it to continue litigating.

The Plan filed the interpleader complaint on April 26, 1995, and deposited the money in the district court's registry. In August, the Plan moved to be discharged of liability and dismissed from the case. Following a case management conference on August 30, however, the hearing on this motion was vacated, and two weeks later, the Plan withdrew its motion. Several months later, the Plan filed a brief opposing Tise's motion for a stay of the federal proceedings while she sought a QDRO in state court, arguing that Tise could not be an "alternate payee" who can obtain a QDRO under ERISA.

■ Although the Plan's contention that the Plan stayed in the litigation at the district court's request is not completely implausible, that circumstance does not explain the Plan's actions thereafter. The Plan's arguments against Tise's motion for a stay, and the evidence supporting them, constituted litigating on the merits, not on the interpleader. The record before us thus supports the district court's conclusion that the Plan was taking sides. We conclude that the district court did not abuse its discretion by determining that the Plan should not be compensated for litigating the merits of the adverse parties' claims to Myers' pension plan proceeds.

Because the district court correctly limited the Plan's fee award to the amount reasonably expended on the interpleader, we need only determine whether the district court properly exercised its discretion in calculating the fee award itself. On this point, the Plan concedes that the record is sketchy. Nowhere in the Plan's declarations does it detail the amount of attorneys' fees expended specifically on the interpleader rather than on the merits. At oral argument, the Plan's counsel conceded that only some $8,000 to $10,000 of the $97,000 the Plan requested was attributable to the interpleader, but admitted that its submissions failed clearly to support even this amount.

■ The burden of establishing entitlement to an attorneys' fees award lies solely with the claimant. *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). "Plaintiff's counsel ... is not required to record in great detail how each minute of his time was expended. But at least counsel should identify the general subject matter of his time expenditures." *Id.* at 437 n. 12. Where the documentation is inadequate, the district court is free to reduce an applicant's fee award accordingly. *Id.* at 433.

The Plan has failed to meet even this rather modest burden. As established above, the district court properly limited the Plan's fees to those reasonably incurred working on the interpleader. The fee award is in line with those commonly granted to interpleader plaintiffs. Based on the district court's superior knowledge of these proceedings, and our limited scope of review, we cannot say that the court abused its discretion in awarding the Plan only $3,000. We therefore affirm the district court's fee award.

AFFIRMED.