Beverly Ann STAHL, Plaintiff,

v.

EXXON CORPORATION, Exxon Mobil Annuity Plan, and Jacqueline Stahl, Defendants.

No. CIV.A. H–99–3029.

United States District Court, S.D. Texas.

July 1, 2002.

Ronald L. Marsh, Attorney at Law, Baytown, TX, for plaintiff.

David M. Rivet, Exxon Mobil Corp., Houston, TX, for defendants.

Jacqueline Stahl, Maxwell, TX, pro se.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendant ExxonMobil Corporation, formerly known

as Exxon Corporation ("Exxon"), and Defendant ExxonMobil Pension Plan's, formerly known as Exxon Annuity Plan ("the Plan"), motion for summary judgment (# 30). In this action, Plaintiff Beverly Ann Robertson, formerly Beverly Ann Stahl ("Beverly"), claims she is entitled to one-half the proceeds of a Surviving Spouse Annuity ("SSA") following the death of her former husband, Andrew Jackson Stahl ("Andrew"). In response, Exxon and the Plan claim that Andrew's wife at the time of his death, Defendant Jacqueline Stahl ("Jacqueline"), is entitled to the benefits because Beverly failed to obtain a valid Qualified Domestic Relations Order ("QDRO") before Andrew's death. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that summary judgment is warranted.

## I. *Background*

Andrew began working for Exxon on January 3, 1979, when was married to Beverly. While working at Exxon, Andrew participated in a "Qualified Joint and Survivor Annuity" plan ("annuity plan"), which provides benefits to Exxon employees when they reach retirement age. The minimum retirement age at Exxon is fifty-five years of age, although, for employees who have worked at Exxon for at least five years, they are eligible to begin receiving benefits at age fifty. In the situation where an employee dies prior to receiving any benefits, the annuity plan provides for the employee's surviving spouse to receive, when the employee would have reached age fifty, fifty percent of the benefits earmarked for the employee, which is known as the SSA component of the annuity plan. In addition to the annuity plan, Andrew also participated in a thrift fund through Exxon, which operates as a type of savings plan. Both benefits vested after five years of employment and were managed for Exxon by the Plan.

Andrew and Beverly divorced on December 22, 1989. The divorce decree contains provisions purporting to dispose of both the annuity and thrift fund benefits accrued by Andrew during his marriage to Beverly. The decree, along with a proposed QDRO,[1] was submitted to Exxon at the time of the divorce but was rejected by the Plan on January 18, 1990, as an invalid QDRO because it did not clearly specify a distribution scheme for each type of benefit. On January 26, 1990, Andrew married Jacqueline, to whom he remained married until his death on July 16, 1997.

Robert Marsh ("Marsh"), Beverly's attorney, and Michael Turner ("Turner"), Andrew's attorney, were both notified of the Plan's rejection of the documents. Marsh filed a revised decree of divorce, along with another proposed QDRO, with the Plan on February 14, 1990. The second attempted QDRO was rejected by the Plan on March 15, 1990, specifically because it did not list the correct name of either the annuity or thrift fund plans. The follow-

---

1. "A QDRO is a type of domestic relations order that creates or recognizes an alternate payee's right to, or assigns to an alternate payee the right to, a portion of the benefits payable with respect to a participant under a plan. A domestic relations order, in turn, is any judgment, decree, or order that concerns 'the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant' and is 'made pursuant to a State domestic relations law (including community property law.') A domestic relations order must meet certain requirements to qualify as a QDRO. QDRO's, unlike domestic relations orders in general, are exempt from both the pension plan anti-alienation provision and ERISA's general preemption clause." *Boggs v. Boggs*, 520 U.S. 833, 846, 117 S.Ct. 1754, 138 L.Ed.2d 45 (1997) (internal citations omitted).

ing day, March 16, 1990, Andrew resigned from Exxon.

On September 4, 1990, after Andrew's resignation, Turner re-filed the same paperwork as previously submitted on February 14, 1990, which was again rejected by the Plan for the same reason. Later that year, a subsequent QDRO was submitted, containing language relating only to the thrift fund. The QDRO includes no provisions addressing the annuity plan and accompanying SSA benefit. This QDRO was accepted, and a check for the proceeds of the thrift fund was issued to Beverly on November 27, 1990.

Andrew died in a plane crash on July 16, 1997, at the age of forty-eight—two years prior to the earliest commencement of annuity plan benefits. During the time period between the acceptance of the thrift fund QDRO and Andrew's death, no additional domestic relations orders were forwarded to the Plan, and no attempt was made to challenge the Plan's rejection of the previously-filed orders relating to the annuity plan. On August 11, 1997, Jacqueline was informed of her potential eligibility for SSA benefits and submitted the paperwork requested by Exxon.

On October 1, 1997, Marsh made inquiries of the Plan regarding Beverly's interest in the SSA. On January 12, 1998, the Plan informed Marsh that because no valid QDRO was in place, Beverly had no enforceable claim to SSA benefits. On June 9, 1998, Marsh submitted a fourth proposed QDRO relating to the annuity plan, which the Plan rejected on July 9, 1998, because it was entered after Andrew's death. It is undisputed that all other technical requirements of a valid QDRO were met. Marsh appealed the rejection of the fourth proposed QDRO pursuant to the Plan's administrative review procedure, and on July 19, 2001, the appeal was denied. By letter dated January 3, 2002, Marsh was notified that the Plan had also reviewed the first three alleged QDROs relating to the annuity plan and had found them not to contain the necessary components of a valid QDRO. In addition, the letter pointed out that none of the proffered QDROs specifically stated that Beverly was to be considered the surviving spouse upon Andrew's death.

Beverly filed suit in August 1999, requesting that Exxon, through the Plan, be ordered to pay her the SSA benefits accrued during Andrew's employment with Exxon until November 29, 1989, the date stipulated in the divorce decree. In the alternative, Beverly requests the court to declare valid the first three purported QDROs submitted to the Plan and order Exxon to pay Beverly her interest in the annuity plan. Also, in the alternative, Beverly asks the court to enter such orders as deemed necessary to enforce the divorce decree and require the Plan Administrator or "any other Alternate Payee" to act as a constructive trustee to facilitate the payment of the annuity benefits directly to Beverly.

## II. Analysis

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The parties seeking summary judgment bear the initial burden of informing the court of the basis for their motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which they believe demonstrate the absence of a genuine issue of material fact.

See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Colson v. Grohman, 174 F.3d 498, 506 (5th Cir.1999); Marshall v. East Carroll Parish Hosp. Serv. Dist., 134 F.3d 319, 321 (5th Cir.1998); Wenner v. Texas Lottery Comm'n, 123 F.3d 321, 324 (5th Cir.1997), cert. denied, 523 U.S. 1073, 118 S.Ct. 1514, 140 L.Ed.2d 667 (1998). A material fact is one that might affect the outcome of the suit under governing law. See Burgos v. Southwestern Bell Tel. Co., 20 F.3d 633, 635 (5th Cir.1994). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505. The moving parties, however, need not negate the elements of the nonmovant's case. See Wallace v. Texas Tech Univ., 80 F.3d 1042, 1047 (5th Cir.1996) (citing Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994)).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to show the existence of a genuine issue for trial. See Celotex Corp., 477 U.S. at 322–23, 106 S.Ct. 2548; Anderson, 477 U.S. at 257, 106 S.Ct. 2505; Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Rushing v. Kansas City S. Ry. Co., 185 F.3d 496, 505 (5th Cir.1999), cert. denied, 528 U.S. 1160, 120 S.Ct. 1171, 145 L.Ed.2d 1080 (2000); Colson, 174 F.3d at 506, Marshall, 134 F.3d at 321–22; Wallace, 80 F.3d at 1047; Little, 37 F.3d at 1075. "[T]he court must review the record 'taken as a whole.'" Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting Matsushita Elec. Indus. Co., 475 U.S. at 587, 106 S.Ct. 1348). All the evi-dence must be construed "in the light most favorable to the non-moving party without weighing the evidence, assessing its probative value, or resolving any factual disputes." Williams v. Time Warner Operation, Inc., 98 F.3d 179, 181 (5th Cir.1996) (citing Lindsey v. Prive Corp., 987 F.2d 324, 327 n. 14 (5th Cir.1993)); see Reeves, 530 U.S. at 150, 120 S.Ct. 2097; Colson, 174 F.3d at 506; Marshall, 134 F.3d at 321; Messer v. Meno, 130 F.3d 130, 134 (5th Cir.1997), cert. denied, 525 U.S. 1067, 119 S.Ct. 794, 142 L.Ed.2d 657 (1999); Hart v. O'Brien, 127 F.3d 424, 435 (5th Cir.1997), cert. denied, 525 U.S. 1103, 119 S.Ct. 868, 142 L.Ed.2d 770 (1999). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255, 106 S.Ct. 2505; Palmer v. BRG of Ga., Inc., 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990); see Christopher Vill. Ltd. P'ship v. Retsinas, 190 F.3d 310, 314 (5th Cir.1999); Samuel v. Holmes, 138 F.3d 173, 176 (5th Cir. 1998); Marshall, 134 F.3d at 321. The evidence is construed "in favor of the non-moving party, however, only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts." Olabisiomotosho v. City of Houston, 185 F.3d 521, 525 (5th Cir.1999); accord Little, 37 F.3d at 1075 ("[w]e do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." (emphasis in original)) (citing Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)).

Nevertheless, "'only reasonable inferences can be drawn from the evidence in favor of the nonmoving party.'" Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 469 n. 14, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (emphasis in original) (quoting H.L. Hayden Co. of N.Y., Inc. v. Siemens Med. Sys., Inc., 879 F.2d 1005,

1012 (2d Cir.1989)). "If the [nonmoving party's] theory is ... senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Id.* at 468–69, 112 S.Ct. 2072. The nonmovant's burden is not satisfied by "some metaphysical doubt as to material facts," conclusory allegations, unsubstantiated assertions, speculation, the mere existence of some alleged factual dispute, or "only a scintilla of evidence." *Little,* 37 F.3d at 1075; *see Hart,* 127 F.3d at 435; *Wallace,* 80 F.3d at 1047; *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)); *State Farm Life Ins. Co. v. Gutterman,* 896 F.2d 116, 118 (5th Cir.1990) (citing *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505). Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548; *Wenner,* 123 F.3d at 324. "In such a situation, there can be 'no genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

## B. *ERISA Preemption*

The Supremacy Clause of the United States Constitution empowers Congress to enact laws that supersede state law by means of an express provision in a federal statute, by implication, or by creating a direct conflict between federal and state law. *See* U.S. Const. art. VI; *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* 514 U.S. 645, 654, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995). "ERISA's express pre-emption clause states that the Act 'shall supersede any and all State laws insofar as they may now or hereafter relate to an employee benefit plan ....' " *Boggs,* 520 U.S. at 841, 117 S.Ct. 1754 (quoting 29 U.S.C. § 1144(a)); *see Egelhoff v. Egelhoff,* 532 U.S. 141, 145, 121 S.Ct. 1322, 149 L.Ed.2d 264 (2001); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 45, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); *Dowden v. Blue Cross & Blue Shield of Tex., Inc.,* 126 F.3d 641, 643 (5th Cir.1997); *Nickel v. Estate of Estes,* 122 F.3d 294, 297 (5th Cir.1997). " 'State law' includes all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1).

Courts have noted that the ERISA preemption provision is "clearly" and "deliberately expansive," has a "broad scope," an "expansive sweep," and is "conspicuous for its breadth." *See Egelhoff,* 532 U.S. at 146, 121 S.Ct. 1322; *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 324, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997); *District of Columbia v. Greater Washington Bd. of Trade,* 506 U.S. 125, 129, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992); *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383–84, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); *FMC Corp. v. Holliday,* 498 U.S. 52, 58, 111 S.Ct. 403, 112 L.Ed.2d 356 (1990); *Pilot Life Ins. Co.,* 481 U.S. at 45–46, 107 S.Ct. 1549; *Dowden,* 126 F.3d at 643; *Nickel,* 122 F.3d at 297. The words "relate to" have been construed in their broadest sense. *See Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 98, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *Corcoran v. United HealthCare, Inc.,* 965 F.2d 1321, 1328 (5th Cir.), *cert. denied,* 506 U.S. 1033, 113 S.Ct. 812, 121 L.Ed.2d 684 (1992); *E–Systems, Inc. v. Pogue,* 929 F.2d 1100, 1103 (5th Cir.), *cert. denied,* 502 U.S. 981, 112 S.Ct. 585, 116 L.Ed.2d 610 (1991).

The Supreme Court has noted, however, that "the term 'relate to' cannot be taken 'to extend to the furthest stretch of its indeterminacy' or else 'for all practical purposes pre-emption would never run its course.'" *See Egelhoff*, 532 U.S. at 146, 121 S.Ct. 1322 (quoting *Travelers Ins. Co.*, 514 U.S. at 655, 115 S.Ct. 1671). "[A] state law 'relates to' an employee benefit plan, and is pre-empted by ERISA, 'if it has a connection with, or reference to, such a plan.'" *Morales*, 504 U.S. at 384, 112 S.Ct. 2031 (quoting *Shaw*, 463 U.S. at 97, 103 S.Ct. 2890); *accord Egelhoff*, 532 U.S. at 146, 121 S.Ct. 1322; *Travelers Ins. Co.*, 514 U.S. at 656, 115 S.Ct. 1671; *Greater Washington Bd. of Trade*, 506 U.S. at 129, 113 S.Ct. 580; *Ingersoll–Rand Co. v. McClendon*, 498 U.S. 133, 139, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990); *Dowden*, 126 F.3d at 643; *Kramer v. Smith Barney*, 80 F.3d 1080, 1083 (5th Cir.1996). Nonetheless, the Supreme Court has "cautioned against an 'uncritical literalism' that would make preemption turn on infinite connections.'" *Egelhoff*, 532 U.S. at 146, 121 S.Ct. 1322 (quoting *Travelers Ins. Co.*, 514 U.S. at 656, 115 S.Ct. 1671).

▪ The "sweeping pre-emption of state law is consistent with Congress's decision to create a comprehensive, uniform federal scheme for the regulation of employee benefit plans." *Corcoran*, 965 F.2d at 1329 (citing *Ingersoll–Rand Co.*, 498 U.S. at 137, 111 S.Ct. 478; *Pilot Life Ins. Co.*, 481 U.S. at 45–46, 107 S.Ct. 1549). "One of the principal goals of ERISA is to enable employers 'to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits.'" *Egelhoff*, 532 U.S. at 148, 121 S.Ct. 1322 (quoting *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 9, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987)). ERISA preemption is designed to protect plan participants by eliminating the threat of inconsistent state and local regulations and to standardize

the laws to permit the nationally uniform administration of employee benefit plans. *See Ingersoll–Rand Co.*, 498 U.S. at 138, 111 S.Ct. 478; *Fort Halifax Packing Co.*, 482 U.S. at 10–11, 107 S.Ct. 2211; *Texas Life, Accident, Health & Hosp. Serv. Ins. Guar. Ass'n v. Gaylord Entm't*, 105 F.3d 210, 217 (5th Cir.), *cert. dismissed*, 521 U.S. 1113, 117 S.Ct. 2501, 138 L.Ed.2d 1006 (1997); *Peckham v. Gem State Mut.*, 964 F.2d 1043, 1051 (10th Cir.1992). In enacting the preemption provision of ERISA, Congress sought to:

> ensure that plans and plan sponsors would be subject to a uniform body of benefit law; the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government.

*Ingersoll–Rand Co.*, 498 U.S. at 142, 111 S.Ct. 478 (citing *FMC Corp.*, 498 U.S. at 60, 111 S.Ct. 403 (citing *Fort Halifax Packing Co.*, 482 U.S. at 10–11, 107 S.Ct. 2211)); *accord Singer v. Black & Decker Corp.*, 964 F.2d 1449, 1452 (4th Cir.1992). "Uniformity is impossible, however, if plans are subject to different legal obligations in different states." *Egelhoff*, 532 U.S. at 148, 121 S.Ct. 1322.

▪ ERISA, therefore, may preempt a related state law even if the state law is not specifically intended to regulate ERISA-governed plans. *See Ingersoll–Rand Co.*, 498 U.S. at 139, 111 S.Ct. 478; *Nickel*, 122 F.3d at 297; *see also Boggs*, 520 U.S. at 844, 117 S.Ct. 1754; *First Nat'l Life Ins. Co. v. Sunshine–Jr. Food Stores, Inc.*, 960 F.2d 1546, 1549 (11th Cir.1992), *cert. denied*, 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993). "[W]here a claim relates to an employee benefit plan governed by ERISA and [is] 'based upon state law of general application *and not a law regulating insurance*,' the state law cause of action is preempted by ERISA." *Cy-*

press *Fairbanks Med. Ctr., Inc. v. Pan-American Life Ins. Co.*, 110 F.3d 280, 284 (5th Cir.), *cert. denied*, 522 U.S. 862, 118 S.Ct. 167, 139 L.Ed.2d 110 (1997) (emphasis in original) (quoting *Hermann Hosp. v. MEBA Med. & Benefits Plan*, 845 F.2d 1286, 1290 (5th Cir.1988)). Preemption does not occur, however, "if the state law has only a tenuous, remote, or peripheral connection with covered plans, … as is the case with many laws of general applicability." *Greater Washington Bd. of Trade*, 506 U.S. at 130 n. 1, 113 S.Ct. 580 (citations and internal quotations omitted); *Operating Eng'rs Health & Welfare Trust Fund v. JWJ Contracting Co.*, 135 F.3d 671, 677 (9th Cir.1998).

■ When determining whether a law is preempted, courts must "look both to 'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans.'" *See Egelhoff*, 532 U.S. at 147, 121 S.Ct. 1322 (quoting *Dillingham Constr.*, 519 U.S. at 324–25, 117 S.Ct. 832 (quoting *Travelers Ins. Co.*, 514 U.S. at 656, 115 S.Ct. 1671)); *see JWJ Contracting Co.*, 135 F.3d at 678. Nevertheless, if the claims asserted are closely related to a covered plan, "ERISA's preemption provision bars state law causes of action even though such preemption may leave a victim of fraud or misrepresentation without a remedy." *Hansen v. Continental Ins. Co.*, 940 F.2d 971, 979 (5th Cir.1991) (citing *Lee v. E.I. Du Pont de Nemours & Co.*, 894 F.2d 755, 757 (5th Cir.1990); *Degan v. Ford Motor Co.*, 869 F.2d 889, 893–95 (5th Cir.1989)). Generally, the lack of an ERISA remedy does not affect a preemption analysis. *See Corcoran*, 965 F.2d at 1333; *Memorial Hosp. Sys. v. Northbrook Life Ins. Co.*, 904 F.2d 236, 248 & n. 16 (5th Cir.1990); *Lee*, 894 F.2d at 757.

"ERISA preempts a state law claim 'if (1) the state law claim addresses an area of exclusive federal concern, such as the right to receive benefits under the terms of an ERISA plan; and (2) the claim directly affects the relationship between the traditional ERISA entities: the employer, the plan and its fiduciaries, and the participants and beneficiaries.'" *Smith v. Texas Children's Hosp.*, 84 F.3d 152, 155 (5th Cir.1996) (quoting *Hubbard v. Blue Cross & Blue Shield Ass'n*, 42 F.3d 942, 945 (5th Cir.), *cert. denied*, 515 U.S. 1122, 115 S.Ct. 2276, 132 L.Ed.2d 280 (1995)); *accord McNeil v. Time Ins. Co.*, 205 F.3d 179, 191 (5th Cir.2000), *cert. denied*, 531 U.S. 1191, 121 S.Ct. 1189, 149 L.Ed.2d 106 (2001); *Dial v. NFL Player Supplemental Disability Plan*, 174 F.3d 606, 610–11 (5th Cir.1999); *Cypress Fairbanks Med. Ctr.*, 110 F.3d at 283; *Hook v. Morrison Milling Co.*, 38 F.3d 776, 781 (5th Cir.1994); *Memorial Hosp. Sys.*, 904 F.2d at 245. A "participant" is defined by ERISA as an "employee or former employee of an employer, or any member or former member of an employee organization, who is or may become eligible to receive a benefit." 29 U.S.C. § 1002(7). A "beneficiary" is a "person designated by a participant or by the terms of an employee benefit plan, who is or may become entitled to a benefit thereunder." *Id.* at § 1002(8).

■ A suit by a participant or beneficiary to recover benefits from a covered plan falls directly within the civil enforcement provision of ERISA, which provides an exclusive federal cause of action for the resolution of such disputes. *See Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 62–63, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (citing *Pilot Life Ins. Co.*, 481 U.S. at 56, 107 S.Ct. 1549). " 'It is clear that ERISA preempts a state law cause of action brought by an ERISA plan participant or beneficiary alleging improper processing of a claim for plan benefits.'" *Dowden*, 126 F.3d at 643 (quoting *Memorial Hosp. Sys.*,

904 F.2d at 245 (citing *Pilot Life Ins. Co.*, 481 U.S. at 48, 107 S.Ct. 1549)). "In short, when beneficiaries seek to recover benefits from a plan covered by ERISA, their exclusive remedy is provided by ERISA, in 29 U.S.C. § 1132(a)(1)(B)." *Hansen*, 940 F.2d at 979 (citing *Degan*, 869 F.2d at 893).

In *Boggs*, the sons of a decedent and his first wife (also deceased) contended that they were entitled to an interest in the decedent's annuity, which was assigned to them pursuant to a testamentary transfer from their mother. *See* 520 U.S. 833, 117 S.Ct. 1754, 138 L.Ed.2d 45. The sons argued the testamentary transfer should be considered a QDRO valid under Louisiana law. *See id.* The second spouse claimed that, pursuant to ERISA, she was entitled to the entire annuity. *See id.* Although the Fifth Circuit found for the sons, the Supreme Court reversed, holding that, despite the fact that community property laws "implement policies and values lying within the traditional domain of the States," ERISA's survivor annuity provisions preempted and controlled the disposition of benefits. *Id.* at 840–44, 117 S.Ct. 1754.

In the case at bar, it is uncontested that Beverly's cause of action arises under ERISA and that ERISA preempts state law in this matter. *See* 29 U.S.C. § 1132.

### C. *Review of Administrator's Decision*

Beverly alleges that the Plan has improperly denied her SSA benefits in violation of ERISA. *See* 29 U.S.C. § 1132. The statute provides, *inter alia*, that a civil action may be brought by a participant or beneficiary "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." *Id.*

■ Generally, under ERISA, when an employee benefit plan gives its administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a reviewing court must evaluate the plan administrator's decision under an abuse of discretion standard. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1305 (5th Cir.1994); *Haubold v. Intermedics, Inc.*, 11 F.3d 1333, 1336–37 (5th Cir.1994); *Perdue v. Burger King Corp.*, 7 F.3d 1251, 1254 (5th Cir. 1993); *Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 636 (5th Cir.1992). Here, the Plan provides the Plan Administrator discretionary authority to interpret the Plan:

> The Administrator–Benefits (and those to whom the Administrator Benefits has delegated authority) shall be vested with full and final discretionary authority to determine eligibility for benefits, to construe and interpret the terms of the core benefit plans in their application to any participant or beneficiary, and to decide any and all appeals relating to claims by participants or beneficiaries.

Furthermore, the specific responsibilities of the Administrator–Benefits include "exercising discretionary authority to interpret the core benefit plans in conducting a full and fair review of claims by participants and beneficiaries, with such interpretation being conclusive for all participants and beneficiaries." Because the Plan expressly grants the Administrator discretionary authority to determine all questions of eligibility and status, the "abuse of discretion" standard applies to the construction of Plan terms. *See Firestone Tire & Rubber Co.*, 489 U.S. at 115, 109 S.Ct. 948.

■ Although the determination of whether a domestic relations order is in fact "qualified" under the Plan is made by the Plan Administrator, the court reviews *de novo* the Administrator's legal interpre-

tation of the meaning of a QDRO, just as it does the meaning of a contract or statute. *See Dorn v. International Bhd. of Elec. Workers,* 211 F.3d 938, 946 (5th Cir.2000) (citing *Matassarin v. Lynch,* 174 F.3d 549, 563 (5th Cir.1999), *cert. denied,* 528 U.S. 1116, 120 S.Ct. 934, 145 L.Ed.2d 813 (2000)); *see also Samaroo v. Samaroo,* 193 F.3d 185, 189 (3d Cir.1999), *cert. denied,* 529 U.S. 1062, 120 S.Ct. 1573, 146 L.Ed.2d 475 (2000). A domestic relations order is considered a judicially approved contract not subject to discretionary determination by the Plan Administrator. *See Matassarin,* 174 F.3d at 563. Therefore, the court must examine the terms of the domestic relations orders at issue and determine whether they are "qualified" under federal law. *See id.*

### D. *Statute of Limitations*

▮ Both Exxon and the Plan argue that Beverly's cause of action relating to the first three proposed QDROs should be dismissed as time-barred. ERISA does not set forth a statute of limitations governing claims for benefits under § 1132(a)(1)(B). *See Hall v. National Gypsum Co.,* 105 F.3d 225, 230 (5th Cir. 1997); *Hogan v. Kraft Foods,* 969 F.2d 142, 145 (5th Cir.1992); *Kennedy v. Electricians Pension Plan, IBEW No. 995,* 954 F.2d 1116, 1120 (5th Cir.1992). Therefore, the state statute of limitations for causes of action most analogous to the claims advanced by the plaintiff must be applied. *See Hall,* 105 F.3d at 230; *Hogan,* 969 F.2d at 145; *Kennedy,* 954 F.2d at 1120, *McClure v. Zoecon, Inc.,* 936 F.2d 777, 778 (5th Cir.1991).

In this instance, Beverly's claim for SSA benefits under the Plan is most analogous to an action under state law for breach of contract. *See Hogan,* 969 F.2d at 145; *St. Julian v. Trustees of the Agreement of Trust for Maritime Ass'n—I.L.A. Pension Plan,* 5 F.Supp.2d 469, 472 (S.D.Tex.1998); *Duncan v. Texas Util. Sys. Employee*

*Med. Plan,* No. Civ. A. 3:94–CV–1303–D, 1997 WL 279869, at *2 (N.D.Tex. May 9, 1997). Indeed, the Ninth Circuit, after finding that the state statute limiting contract actions applied to a claim for benefits under ERISA, noted "[o]ur answer is the same as that adopted in every Circuit that has considered the timeliness of a benefits claim under ERISA." *Flanagan v. Inland Empire Elec. Workers Pension Plan & Trust,* 3 F.3d 1246, 1252 (9th Cir.1993) (citations omitted). Hence, Beverly's claim for ERISA benefits is governed by the Texas, four-year statute of limitations applicable to breach of contract claims. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.004; *Hogan,* 969 F.2d at 145; *St. Julian,* 5 F.Supp.2d at 472; *Duncan,* 1997 WL 279869, at *2.

▮ In the case at bar, Beverly's cause of action accrued on the date her attorney received the Plan's letter of January 12, 1998, denying her claim for SSA benefits, as a cause of action under ERISA accrues when a request for benefits is denied. *See Hall,* 105 F.3d at 230; *Hogan,* 969 F.2d at 145; *St. Julian,* 5 F.Supp.2d at 472. In any event, the first three letters rejecting the proposed QDROs do not constitute a denial of benefits because the letters state that the distribution of benefits was to be put on hold until Beverly's attorney submitted a domestic relations order that could be qualified or the conflicting claims to benefits were resolved. The first express denial of benefits was the Plan's letter of January 12, 1998. Beverly filed suit in August 1999, well within the four-year limitation period. Consequently, Beverly's claim for SSA benefits under the Plan is timely.

### E. *The Pre–Death Proposed QDROs*

Beverly does not dispute that the first three alleged QDROs submitted to the Plan regarding annuity benefits do not

satisfy the statutory requirements. She requests, however, that the court review the divorce decree and allow recovery based on the manifest intent of the parties. The divorce decree was entered contemporaneously with the first proposed QDRO and then, after rejection by the Plan, was amended and filed with the second and third proposed QDROs.

A QDRO is a mechanism created by Congress in the Retirement Equity Act ("REA") of 1984, which amended ERISA. *See* 29 U.S.C. § 1001 *et seq.* Through the REA, Congress enhanced the protection available to divorced spouses and their interest in retirement funds accrued during marriage. *See Boggs,* 520 U.S. at 847, 117 S.Ct. 1754. "The QDRO provisions protect those persons who, often as a result of divorce, might not receive the benefits they otherwise would have had available during their retirement as a means of income." *Id.* at 854, 117 S.Ct. 1754. In order to accomplish this goal, the REA requires that "[e]ach pension plan shall provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order." 29 U.S.C. § 1056(d)(3)(A). Moreover, under the REA, "[e]ach plan shall establish reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders." 29 U.S.C. § 1056(d)(3)(G)(ii).

Under ERISA, in the absence of a QDRO or a valid election by the participant with the consent of his spouse, ERISA benefits provided through a pension plan "may not be assigned or alienated." 29 U.S.C. § 1056(d)(1). QDROs must contain certain information in order to convey ERISA benefits. *See Samaroo,* 193 F.3d at 187–88; *Hawkins v. Commissioner,* 86 F.3d 982, 989 (10th Cir.1996); *see also Dorn,* 211 F.3d at 947. The statute mandates that a QDRO specifically

state the extent of the alternate payee's interest in the plan. *See id.* In order to qualify as a QDRO, a domestic relations order must clearly specify:

> (i) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
>
> (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,
>
> (iii) the number of payments or period to which such order applies, and
>
> (iv) each plan to which such order applies.

29 U.S.C. § 1056(d)(3)(C); *see Metropolitan Life Ins. Co. v. Bigelow,* 283 F.3d 436, 441 (2d Cir.2002); *In re Nelson,* 274 B.R. 789, 795 (8th Cir. BAP 2002); *Hawkins,* 86 F.3d at 989 (citing *Commissioner v. Lester,* 366 U.S. 299, 301, 303, 306, 81 S.Ct. 1343, 6 L.Ed.2d 306 (1961)).

### 1. *The First Proposed QDRO*

The divorce decree, dated December 22, 1989, which was submitted as the first proposed QDRO, provides: "Beverly Ann Stahl is awarded the sum of fifty (50%) percent of the total funds held in his [Andrew's] account in the Exxon Co., U.S.A. Annuity Plan on November 29, 1989." In the letter rejecting the decree as a QDRO, Exxon stated that the language was not sufficiently specific to allow the distribution of the benefits ostensibly granted in the divorce decree.

■ ERISA contains an automatic survivor benefit provision, which applies to qualified plans that are required to distribute benefits in the form of a life annuity. *See* 29 U.S.C. § 1055(a)(2) ("in the case of a vested participant who dies before the annuity starting date and who has a surviving spouse, a qualified preretirement

survivor annuity shall be provided to the surviving spouse of such participant"). Under ERISA, a plan may elect to include language precluding a spouse from receiving benefits unless the spouse is the participant's current spouse and has been married to the participant for the year preceding the date the participant retires or, if the participant dies prior to retirement, the date of his death. *See* 29 U.S.C. § 1055(f)(1). "[A] former spouse can replace the current spouse as the beneficiary of the plan if they [sic] obtain a qualified domestic relations order ('QDRO'), recognizing the former spouse as an alternate payee." *Rivers v. Central & S.W. Corp.*, 186 F.3d 681, 683 (5th Cir.1999) (citing 29 U.S.C. § 1056(d)(3)(A)). A QDRO may rebut the presumption that a current spouse is entitled to survivor annuity benefits if it expressly provides that a former spouse shall retain his or her rights as the surviving spouse. *See Dorn*, 211 F.3d at 947 n. 23; *Rivers*, 186 F.3d at 683; Daniel N. Janich, *When Remarriage Muddies the Waters*, 24–FALL Fam. Adv. 39 (2001). "In such circumstances, the designation of the former spouse as the alternate payee of the surviving spouse annuity trumps any claims thereto by another person who subsequently becomes the *de facto* surviving spouse of the participant." *Dorn*, 211 F.3d at 947 n. 23.

■ In this instance, the first proposed QDRO fails to meet the prerequisites for a QDRO because it does not clearly specify the distribution method for each award and does not expressly state that Beverly shall receive the SSA payments, the part of the Plan to which she now claims an entitlement. Therefore, the first domestic relations order cannot be deemed a QDRO with regard to the payment of SSA benefits.

2. *The Second and Third Proposed QDROs*

The second and third proposed QDROs are identical and were submitted with a revised version of the divorce decree. The problems associated with these alleged QDROs are similar to the deficiencies noted above with respect to the first proposed QDRO. The documents do not specifically list the correct name of either the annuity or thrift fund plan and do not specifically state that Beverly shall be considered the surviving spouse upon Andrew's death. Absent express language relating to the payment of SSA benefits or the SSA plan, a former spouse is not considered the surviving spouse for payment purposes. *See Dorn*, 211 F.3d at 947 n. 23; *Samaroo*, 193 F.3d at 188; *Rivers*, 186 F.3d at 683.

F. *The Post–Death Proposed QDRO*

Exxon and the Plan claim that the domestic relations order entered after Andrew's death is not enforceable as a QDRO under federal law. There is a dearth of authority on the issue of whether a domestic relations order awarding survivor benefits to a former spouse, entered after the death of the participant but before the participant's earliest potential retirement date, is an enforceable QDRO if it divests the interest of the spouse married to the participant at the time of his death. In dispute here is whether, in the absence of a pre-death QDRO awarding the benefits to an ex-spouse, survivor annuity benefits vest in a former employee's current surviving spouse on the date of the participant's death or on the earliest date he would have been eligible to receive retirement benefits had he lived.

Neither the Supreme Court nor the Fifth Circuit has addressed this precise issue. Defendants rely on the Fifth Circuit's decision in *Rivers* in support of their position. *See* 186 F.3d at 683–84. Al-

though the proposed QDRO in *Rivers* was entered after the participant's death, there is no discussion of the effect of a posthumous domestic relations order issued prior to the participant's retirement. Instead, *Rivers* focuses upon the effect of a QDRO entered after the retirement of the plan participant. *See id.* The ex-wife in *Rivers* attempted to obtain a QDRO following the death of her former spouse, who had already retired and received benefits for approximately four years before his death. *See id* at 682. The court in *Rivers* held that a domestic relations order entered after the vesting of the current spouse in a SSA plan is not a valid QDRO. *See id.* at 683–84. The court found that the pension benefits irrevocably vested in the participant's current spouse on the day he retired and forever barred his former spouse from acquiring an interest in the participant's pension plan. *See id.*

The court in *Rivers* relied on the reasoning utilized by the Fourth Circuit in *Hopkins v. AT & T Global Info. Solutions Co. See* 105 F.3d 153, 157 (4th Cir.1997). In *Hopkins*, the facts were similar to those of *Rivers*, but the participant was not deceased. *See id.* at 154–55. The Fourth Circuit declined to enforce a proposed QDRO entered subsequent to the participant's retirement, finding that surviving spouse benefits vested in the spouse married to the participant on the date of retirement. *See id.* at 157. The court reasoned that no viable QDRO could be entered after that point in time because it would, in effect, divest the current spouse of her interest in the pension benefits. *See id.* at 156–57. The court noted that such a result "not only is consistent with the overall framework of ERISA, but also balances the competing interests of the former and current spouses," pointing out that a former spouse's interest in surviving spouse benefits could be protected by obtaining a QDRO before the participant retires. *Id.* at 157.

In *Dorn*, a participant's ex-wife sought to continue the payment of a portion of his retirement annuity, which she had been receiving before his death pursuant to a QDRO entered prior to his retirement. *See* 211 F.3d at 940–41. The plaintiff was not married to the participant either at the time of his retirement or on the date of his death. *See id.* at 944. The participant had remarried prior to his retirement and was still married to his subsequent spouse when he died. *See id.* The Fifth Circuit ruled that because the former spouse was not designated as a surviving spouse in the QDRO, she was not entitled to any further benefits after the plan participant died. *See id.* at 946–47. The court noted that, in the absence of a QDRO so designating her, the former spouse could not be deemed a "surviving spouse" because she was no longer married to the plan participant (1) during the applicable election period, (2) on the annuity starting date, or (3) at the time of his death. *See id.* at 947.

Although there is no Fifth Circuit authority directly on point, several other courts have addressed the impact of a proposed QDRO entered post-death but before the retirement of the plan participant. *See Samaroo*, 193 F.3d at 187; *Davenport v. Davenport*, 146 F.Supp.2d 770, 780 (M.D.N.C.2001); *Guzman v. Commonwealth Edison Co.*, No. 99 C 582, 2000 WL 1898846, at * 2 (N.D.Ill.Dec.28, 2000); *Ross v. Ross*, 308 N.J.Super. 132, 705 A.2d 784, 792–92, 796–97 (Ct.App.Div.1998). Pursuant to ERISA, when the participant dies prior to retirement, pension benefits are paid to the participant's surviving spouse as a pre-retirement survivor annuity. *See* 29 U.S.C. § 1055(e); *Samaroo*, 193 F.3d at 187; *Hopkins*, 105 F.3d at 154 n. 1. The majority of cases hold that a surviving spouse annuity vests on the date of the participant's death and a proposed QDRO entered posthumously is not enforceable. *See Samaroo*, 193 F.3d at 187;

*Davenport,* 146 F.Supp.2d. at 780; *Guzman,* 2000 WL 1898846, at \*2; *Ross,* 705 A.2d at 792–92, 796–97; *see also In re Marriage of Norfleet,* 243 Ill.App.3d 925, 184 Ill.Dec. 63, 612 N.E.2d 939, 943 (4th Dist.1993). "Courts have routinely concluded that rights to survivor's benefits are fixed as [of] the participant's death, and a valid QDRO cannot be entered after the participant's death that would expand the liability of the Plan." *Guzman,* 2000 WL 1898846, at \*2.

In *Samaroo,* the former spouse of a plan participant, who had not remarried and had not yet retired, sought to amend the divorce decree *nunc pro tunc* after the participant's death to provide for an award of a pre-retirement survivor's annuity. *See* 193 F.3d at 186–87. The Third Circuit relied on similar reasoning as that utilized in *Hopkins* to conclude that a domestic relations order entered after the death of the plan participant is not an enforceable QDRO. *See id.* at 190. The appellate court upheld the district court's ruling that the ex-wife's entitlement to a survivor's annuity was to be determined as of the day the participant died and that the amended divorce decree represented an attempt to obtain increased benefits from the plan. *See id.* at 189–91. The court found that when the participant died without remarrying or naming the ex-spouse as an alternate payee of the survivor's rights in a pre-death QDRO, the right to dispose of the benefits lapsed. *See id.* at 191. Similarly, in *Davenport,* the court held that survivor's annuity benefits vest in the surviving spouse on the date of the participant's death and that a state court cannot issue a valid post-death QDRO. *See* 146 F.Supp.2d at 780.

In *Ross,* the decision most analogous to the case at bar, the court ruled that, in the absence of a QDRO entered prior to the participant's death, a former spouse was not entitled to the proceeds of the partici-pant's pension plans, which were payable to the participant's current surviving spouse. *See* 705 A.2d at 792–94, 796–97. The court refused to qualify a domestic relations order entered after the participant's death purporting to grant the benefits to the former spouse. *See id.* The court noted that under ERISA, survivor benefits from a pension plan automatically pass to the current surviving spouse upon the participant's death. *See id.* at 792. "[W]here a surviving spouse has not waived her right to benefits and a QDRO does not exist, ERISA prevents a participant from naming a beneficiary other than a surviving spouse. In that case, a participant will be unable to alienate any of his or her pension plans, even by distribution in a PSA [property settlement agreement]." *Id.* at 793 (citing *Hawkins,* 86 F.3d at 988). The *Ross* court reasoned that because the required beneficiary change was not made, in that a QDRO was not entered prior to the participant's death which would allow the proceeds to be alienated under ERISA, the spouse married to the participant at the time of his death was entitled to the pension proceeds as the surviving spouse. *See id.* at 796. The decision concludes that "federal law is clear that where a QDRO does not exist, one should not be entered to save the meaning of a property settlement agreement." *Id.* at 797.

Here, the one valid QDRO, limited in effect to benefits under the thrift fund, as well as the final divorce decree, do not designate Beverly as Andrew's surviving spouse for the purpose of receiving SSA benefits under the Plan. A handful of decisions hold that where the participant has not remarried, the former spouse can enforce a post-death QDRO if the interest of the former spouse in surviving spouse payments is evident in the divorce decree or if the funds are necessary to fulfill obligations in a child support order. *See Trustees of Dirs. Guild. of America–Pro-*

*ducer Pension Benefits Plans v. Tise,* 234 F.3d 415, 426 (9th Cir.2000); *Patton v. Denver Post Corp.,* 179 F.Supp.2d 1232, 1239 (D.Col.2002). These cases contravene the weight of authority and are readily distinguishable from the case at bar, as Andrew had remarried at the time of his death and the proposed QDROs do not contain provisions pertaining to child support.

Furthermore, the language of the Plan indicates that a current spouse obtains a vested right to a surviving spouse annuity on the date of the participant's death, although the annuity may not be payable until a later date, as when the participant would have reached retirement age. The Plan provides in Section 5.1:

> When a person who has Surviving Spouse Annuity coverage in effect, dies, the person's surviving spouse acquires a matured right
>
> • in the case of an employee, against the person's employer, or
>
> • in the case of a continuing employee or former employee, against the person's last employer
>
> to a Surviving Spouse Annuity.
>
> In this connection, "Surviving Spouse Annuity" means an annuity, once commenced, for the life of the surviving spouse annuitant. The "surviving spouse annuitant" is the surviving spouse to whom the person has been married for one year or more at the time of the person's death.

The Plan defines a "Qualifying Spouse" in Section 17(qq) as a person's spouse who:

> • is living,
>
> • was married to the person during the last complete year before the person's death,
>
> • was either living with the person or being supported by the person to the extent of 20% of the person's recog-

nized compensation during the terminal period, and

> • has not remarried.

In Section 17(rr) of the Plan, a "Qualifying Survivor" is defined, *inter alia,* as a "Qualifying Spouse" of a principal annuitant who "is living on the first of the month following the later of the month in which the principal annuitant or the last surviving designated beneficiary of the principal annuitant dies." The Plan provides at Section 17(yy) that " 'spouse' except where the text says otherwise, means recognized spouse." A "recognized spouse" of a stated person is, in turn, defined in Section 17(tt) as "another person with whom the stated person has entered most recently into a recognized marriage." A "recognized marriage" is defined as a "legal or colorable marriage that has not been followed by a legal or colorable divorce." Hence, in the absence of a valid QDRO, the Plan, as permitted by the REA, has excluded from eligibility for SSA benefits a spouse who was not married to the participant throughout the one-year period ending on the date of the participant's death. *See* 29 U.S.C. § 1055(f)(1)(B).

Because the fourth domestic relations order, submitted to the Plan after Andrew's death, was not entered until after Jacqueline's right to a survivor's annuity had already matured, it does not qualify as a QDRO sufficient to divest Jacqueline of her interest in the SSA benefits. *See Samaroo,* 193 F.3d at 190; *Rivers,* 186 F.3d at 683–84; *Hopkins,* 105 F.3d at 153; *Davenport,* 146 F.Supp.2d at 780; *Guzman,* 2000 WL 1898846, at *3–6; *Ross,* 705 A.2d at 796–97. Indeed, the text of the domestic relations order itself recognizes that it cannot displace legally mandated benefits due a subsequent spouse, stating in Section III, Subsection A:

> Alternate Payee shall receive all Surviving Spouse Annuity benefits up to and

including the full amount of the award in this order in the event of Participant's death before payments begin to either the Participant or Alternate Payee. *This amount is limited by, and not an award of, any benefit legally mandated to be paid to a subsequent spouse who survives Participant.*

(emphasis added). Section V of the order further states, "This Order does not require the Plan to provide benefits to Alternate Payee that are required to be paid ... to a subsequent spouse as a legally mandated benefit." Thus, while equity may call for an award to Beverly of the pension benefits accrued during her marriage to Andrew, it was incumbent upon her to obtain a valid QDRO prior to Andrew's death to effectuate the intent of the parties expressed in the divorce decree. Without a viable pre-death QDRO, an order of this court awarding SSA benefits to Beverly would contravene the anti-assignment and anti-alienation provision of ERISA. *See* 29 U.S.C. § 1056(d)(3)(A); *Ross,* 705 A.2d at 785.

Such an outcome comports with the analyses of several commentators on this subject. *See* Janich, *supra;* Bruce L. Richman, "Tax Tips & Traps," 24–FALL Fam. Advoc. 36 (2001); "When is it Too Late to Get a QDRO?," 8 No. 6 ERISA Litig. Rep. 24 (2001); Harvey B. Wallace, "Retirement Benefits Planning Update," 14–FEB Prob. & Prop. 55 (Jan./Feb.2000). As Janich explains:

> Under the survivor benefit rules, the participant's current spouse at the time the participant retires or, if the participant dies prior to retirement, as of the date of his death, is deemed to be the participant's "surviving spouse." This presumption is important in determining who is entitled to receive the balance of the participant's retirement benefits upon his death. If the participant is remarried at the time of retirement or, if earlier, his death, then his former

spouse will not be entitled to receive these benefits, absent a clear designation of the former spouse as the "surviving spouse" in a QDRO. Therefore, a QDRO may rebut the current spouse presumption if it expressly provides that a former spouse shall retain her rights as the surviving spouse.

\*       \*       \*       \*       \*       \*

> Unfortunately, failure to include a survivorship provision in the QDRO often goes undetected until the participant dies or retires, that is, when the survivor benefits irrevocably vest in the current spouse and it is too late to do anything about it.

24–FALL Fam. Advoc. 39, 40. Unfortunately for Beverly, because none of the pre-death domestic relations orders qualifies as a QDRO, the right to a surviving spouse annuity irrevocably vested in Jacqueline upon Andrew's death, cutting off any ability of Beverly to recover benefits under the Plan.

Policy considerations also support this result. "One of the principal goals of ERISA is to enable employers 'to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits.'" *Egelhoff,* 532 U.S. at 148, 121 S.Ct. 1322 (quoting *Fort Halifax Packing Co.,* 482 U.S. at 9, 107 S.Ct. 2211). ERISA requires a plan fiduciary "to administer the plan 'in accordance with the documents and instruments governing the plan.'" *Id.* at 151 n. 4, 121 S.Ct. 1322 (citing 29 U.S.C. § 1104(a)(1)(D)). As the Third Circuit pointed out in *Samaroo:*

> successful operation of a defined benefit plan requires that the plan's liabilities be ascertainable as of particular dates. The annuity provisions of a defined benefit plan are a sort of insurance, based on actuarial calculations predicting the future demands on the plan.... Allow-

ing the insured to change the operative facts after he has lost the gamble would wreak actuarial havoc on administration of the Plan.

193 F.3d at 190. In addition, "this approach fulfills the Congressional intent 'that ERISA plans be uniform in their interpretation, simple in their application,' and 'allow parties to be certain of their rights and obligations.'" *Heggy v. American Trading Employee Retirement Account Plan,* 56 S.W.3d 280, 284 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (quoting *McMillan v. Parrott,* 913 F.2d 310, 312 (6th Cir.1990)).

Accordingly, this court cannot enforce the fourth domestic relations order entered after Andrew's death, where the effect would be to divest Jacqueline of her statutorily mandated interest in SSA benefits. Although the last proposed QDRO was drafted correctly, it is without legal effect because it was not in place prior to Andrew's death, when Jacqueline's right to surviving spouse benefits matured and vested under the Plan. Thus, the Plan Administrator's denial of Beverly's claim for benefits was not improper, much less an abuse of discretion. Rather, the Administrator's determination comports with the provisions of ERISA as modified by the REA, the express language of the Plan, the weight of authority, and the underlying policy considerations.

III. *Conclusion*

Accordingly, Defendants ExxonMobil Corporation and ExxonMobil Annuity Plan's Motion for Summary Judgment (# 30) is GRANTED. There remain no material facts in dispute, and Defendants are entitled to judgment as a matter of law.